[No. C027096. Third Dist. Mar. 24, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
NATHANIEL MAURICE POPLAR, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the following exceptions: parts I-B, I-C, II, III, and IV.

COUNSEL

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Carlos A. Martinez and Charles A. French, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CALLAHAN, J.—A jury convicted defendant of forcible rape (Pen. Code, § 261, subd. (a)(2); undesignated section references are to this code). Defendant admitted a prior felony conviction for assault with a firearm (§ 245, subd. (a)(2)) within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and for the purposes of a five-year enhancement (§ 667, subd. (a)).

Sentenced to state prison for 16 years (upper term of 8 years doubled for the strike prior),[1] defendant appeals. He contends (1) the trial court erroneously admitted evidence of prior acts of violence, (2) the trial court erroneously admitted evidence of telephone conversations between defendant and the victim, (3) the trial court erroneously instructed in the language of CALJIC Nos. 2.50, 2.50.1 and 2.23.1, and (4) his sentence must be reduced to eight years because the strike prior was dismissed. We will affirm.

FACTS

About 9:30 p.m. on September 27, 1996, A. K. arrived at the apartment she shared with defendant, took a shower, went to bed and watched television. A. K. had been living with defendant since about October 1995. About 11:00 p.m., defendant arrived at the apartment. They started arguing. A. K. wanted to get out of their relationship as she had told him on four prior occasions.

The first time A. K. told defendant she wanted to get out of the relationship, he told her he was not going anywhere. They had an argument and he slapped her causing her head to hit the wall. The second time, defendant left

---

[1] Prior to trial, the prosecution represented that defendant's maximum exposure was sixteen years and offered the low term of three years doubled for the strike prior for a total term of six years. At sentencing, the court granted the prosecution's motion to dismiss the five-year enhancement to reflect the represented maximum exposure.

for two days but then asked to return. A. K. allowed him to return because she was afraid of him based on the first incident. The third time, he refused to leave. The fourth time, they argued and he locked her in the room with him. She called the police. The police talked to both of them but defendant remained.

During the relationship, defendant had called her demeaning names and had threatened that he would not let her be with anyone else.

The argument on September 27 lasted a few hours while they were on the bed in her bedroom. During the argument, defendant grabbed her underwear and tried to pull them off. She held them on, telling him to stop. After a few minutes of pulling on her underwear, defendant told her, "You are mine. You are not going anywhere." He climbed on top of her despite her struggle to kick him off. She is five feet, seven inches tall and weighed about one hundred twenty-five pounds, and he is five feet, eleven inches tall and weighed more than she did. Defendant did not remove but moved her underwear to the side and during the struggle, a seam tore. A. K. cried and told him she did not want to have sex. He proceeded to have intercourse with her for three to five minutes during which she cried for him to stop. He finally did stop. She went to the bathroom and stayed for a couple of minutes until he started banging on the door telling her to open it. When she came out, he apologized. She slept on the couch in the living room.

The next morning, A. K. went to work and called the police reporting the incident.

Sacramento Police Officer Laurie Zoulas interviewed A. K. who was, at times, too upset to speak.

A rape examination was inconclusive that the semen found belonged to defendant.

Between five and ten times after the incident, defendant called A. K. He did not want her to testify. He asked her to say it never happened.

A. K. admitted that she had testified at the preliminary hearing that she had. threatened to call the police if defendant did not get out of her house. Based on a prior incident, A. K. admitted that she knew that if she called the police, the police would not remove defendant just because she wanted him out of the house.

A. K. denied that she was lying about the rape as a way to get defendant out of her apartment. Prior to the preliminary hearing, she admitted telling an

officer that she did not want to press charges because she was afraid if she did, defendant would return and hurt her. Her fear was based in part on what had happened between them and his telephone calls after he was taken into custody.

At the time of the incident, she was afraid to fight back because he had slapped her before and because she had seen him assault three other people.[2] A. K. had seen defendant drag a man around by his jacket, stab a man in the neck with a fork, and stab her friend in the hand with tweezers after having thrown a cup. A. K. knew that defendant was capable of hurting her badly.

A. K. had two telephone messages on her answering machine from defendant who was in jail. After listening to the messages, A. K. was scared because of defendant's tone of voice and at the end, he stated, "I'll get with y'all when I get out."[3]

Defendant claimed A. K. was his fiancée when the incident occurred. On September 25, 1996, he returned to the apartment about midnight. A. K. accused him of having been with another woman. They argued for a few hours, watched television and then went to bed. About 7:00 a.m. on September 26, 1996, they had sexual intercourse. They got up and did laundry. Defendant's mother dropped off some money. About 4:00 p.m., defendant left for class and returned about 10:30 p.m. A. K. was upset because he had not returned immediately after class. That evening, they had sexual intercourse. On September 27, 1996, after A. K. went to work, defendant left for an appointment and returned at 5:00 p.m. A. K. arrived about 7:00 p.m. Defendant left at 8:30 p.m. and returned around midnight. A. K. was upset because he was back to his same pattern of staying out late. She thought he was having an affair because he had had an affair before and she found out about it. Their conversation lasted about three hours. He then went to sleep. He denied having, attempting to have, or forcing A. K. to have sexual intercourse that night. Defendant had told an officer that the last time they had consensual sexual intercourse was sometime in the afternoon on September 27. A. K. slept on the couch. Defendant told an officer that A. K. had slept on the couch part of the night and then returned to the bedroom during the night.

A. K. was still upset in the morning and said she would call him from work. She called about 9:00 a.m. and told him to pack his belongings and

---

[2] The court overruled defense counsel's relevance objection and instructed the jury that the prior acts of physical violence against persons other than the victim were offered to show the victim's state of mind.

[3] The prosecution played the tape-recorded message.

move to his mother's. She wanted him out by 9:30 a.m. When defendant was talking to his mother, police officers arrived to arrest him.

While in custody, defendant admitted calling A. K. between five and ten times. He denied asking her to lie. He told her she needed to tell the truth because she had falsely accused him. Defendant claimed A. K. did not want to press charges but that she was being pressured to do so by the prosecutor. Explaining the message on A. K.'s answering machine, defendant said he meant he would see her in court and denied threatening her in any way.

Defendant admitted he had a 1988 felony conviction for assault with a firearm.

Defendant admitted that he had lost his temper and had slapped A. K. during an argument in October 1995. He denied that her head had hit the wall and claimed she had no injuries. He denied ever stabbing a woman with tweezers or a man with a fork and denied dragging a man by the coat. In the tape-recorded message where defendant used the word "trick" and "white boy," defendant explained he was talking to someone in the jail.

Defendant denied that he had been drinking; he does not drink at all. In a taped phone call with his brother, defendant admitted he had stated that he "came home real, real drunk." Defendant then admitted that he does drink on occasion but did not believe he did so on the night of the incident.

On cross-examination, defendant was asked about an incident that occurred on October 2, 1994, between him and an ex-girlfriend, Shawndel K. Defendant did not recall beating her but did remember being arrested. He denied calling her from jail and threatening her. With respect to an incident that occurred on March 26, 1995, between him and Pamela J., defendant admitted arguing with her but denied he was physically violent to her or to her child. He recalled having been arrested but denied calling her from jail and discussing the incident with her in any manner. When he was released, he went to her apartment and a few weeks later, he was removed by the police. Defendant did not recall the circumstances of his removal. Pamela did not go to court. Defendant denied having had a conversation with her.

Defendant recalled speaking to his mother on the telephone on November 16, 1996. Defendant told his mother that Pamela had changed her story and told the truth.

Mary Lynette Broussard, defendant's mother, called A. K. after defendant was arrested. A. K. explained that she had ordered defendant out of the

apartment by 9:30 a.m. or the police would be there. A. K. did not say that defendant had sexually assaulted her or raped her. A. K. and Broussard had grown close over the year they had known one another. A. K. had lived with Broussard for four months. Broussard never heard A. K. lie to get someone in trouble. Broussard never heard A. K. threaten defendant that if he did not move out, she would lie about him. Defendant called Broussard from jail. Broussard denied that defendant asked her to participate in some fashion in contacting A. K. Broussard admitted that she told defendant not to try to make her a part of it meaning "[i]f he gets in trouble, [she] leave[s] it up to him to get himself out of it." During one of their conversations, defendant told Broussard, "I'm breaking her down. She's sitting there crying on the phone, mom."

Pamela J. testified in rebuttal. Defendant is the father of her child. Pamela had a relationship with defendant off and on for five years. About March 1995, they had a physical fight where defendant shoved her, they struck one another, he pulled out some of her hair and then pushed her on a glass coffee table, breaking it. The police came and defendant was arrested. From the jail, defendant called her twice. The first time, he was friendly and she was upset. She admitted she changed her statement that she had given to officers. She initially told them that defendant had struck the first blow. She denied that defendant threatened her to change her story. About two weeks later, defendant was removed from her apartment by the police for trespassing.

Shawndel K. had a relationship with defendant for about a year. On October 2, 1994, after they broke up, defendant barged his way into her apartment, picked her up and slammed her into the wall putting a hole in the wall. Defendant then hit and kicked her in the head. Defendant was arrested. He called her repeatedly from jail and said, "Bitch, I'm going to get y'all," meaning her and her roommates, and threatened, "I'm going to fuck you up." She considered the calls to be threatening.

## DISCUSSION

### I

### A

Prior to trial, the prosecution moved *in limine* to allow into evidence the prior incidents involving Pamela J. and Shawndel K. pursuant to

Evidence Code section 1109.[4] The prosecution argued that the evidence of the incidents with Pamela and Shawndel involved defendant's assaulting the victims, which "should be admitted to establish that he has a propensity or disposition to violence against women with whom he has had a relationship." The prosecution further argued that the incidents were more probative than prejudicial in showing a propensity or character trait.[5]

---

[4]At the time of the offense, Evidence Code former section 1109 provided: "(a) Except as provided in subdivision (e), in a criminal action in which the defendant is accused of an offense involving ·domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.

"(b) In an action in which evidence is to be offered under this section, the people shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least 30 days before the scheduled date of trial or at a later time as the court may allow for good cause.

"(c) This section shall not be construed to limit or preclude the admission or consideration of evidence under any other statute or case law.

"(d) As used in this section, 'domestic violence' has the meaning set forth in Section 13700 of the Penal Code.

"(e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

Penal Code section 13700 provides in relevant part as follows:

"(a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

"(b) 'Domestic violence' means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship. . . ."

[5]The prosecution represented the following in his motion *in limine*:

"On 02 October 1994 Shawndel K[.] had be[e]n dating the defendant for over a year, but was trying to break up with him. At about 10:00 p.m. she heard a knock on the door of her residence. She apparently observed a man by the name of Travis Montgomery outside, and opened the door. When she did so the defendant, who had been hiding in the shadows nearby, pushed his way in to the apartment. The defendant picked the victim up and slammed her against a wall, putting a hole in it. He then began kicking her on the floor. When she tried to leave he pretended that he had a gun. The Fresno SWAT team was called and, ultimately, the defendant surrendered to police. [¶] After the defendant was placed in custody he telephoned Ms. K[.] and threatened her. She reported the call. [¶] The defendant ultimately pled to a misdemeanor charge of cohabitant abuse. A fair and accurate copy of the reports concerning these incidents is included as Exhibit One."

"On 26 March 1995 the defendant got into an argument with a former girlfriend by the name of Pamela J[.], with whom he had had a child in 1994. He dragged her by the hair into an apartment, beat her with his fists, and put his foot on a baby of hers (the child was not his). Ms. J[.] fled to a nearby apartment and the defendant pursued her there. Once there he pushed her over a glass table in the living room, shattering the glass. The defendant was arrested leaving the scene with his son. [¶] On 04 May 1995 the defendant entered Ms. J[.]'s apartment without her permission. Law enforcement was called. They ultimately forced entry and arrested the defendant for trespassing. [¶] The defendant ultimately pled to a

The court determined that the evidence was inadmissible in the prosecution's case-in-chief but was admissible in the event consent or motive became an issue.[6]

The court reconsidered its ruling when the defense stated that consent would not be an issue. The defense argued the incident never occurred and A. K. was lying. The prosecutor claimed the evidence fit within Evidence Code section 1109 and Penal Code section 13700, and that the current incident, rape, was a similar crime of violence and control, "domestic violence" at "a worse level." The prosecutor argued the evidence was not cumulative but rather corroborative of A. K.'s testimony. The court took the matter under submission.

The court later determined that the evidence was more probative than prejudicial in that it did not show mere propensity, but sufficient similarity, that is, in each incident there had been a family-type relationship, a breakup, and then defendant's threatening the victim through phone calls or urging the victim to change her story.

On appeal, defendant contends the evidence was inadmissible under Evidence Code section 1101, subdivision (b).[7] Moreover, he argues, the evidence was inadmissible under Evidence Code section 1109 and Penal Code section 13700, which make no mention of rape, only domestic violence. Further, he claims that the prior incidents were completely different. He argues the court abused its discretion under Evidence Code section 352 in admitting the evidence, which was highly inflammatory and far more prejudicial than probative.

---

misdemeanor charge of cohabitant abuse. A fair and accurate copy of the reports concerning these incidents i[s] included as Exhibit Two."

Exhibits one and two consisted of the police reports and related documents.

[6]The trial court was wrong. Evidence Code section 1109 was added by the Legislature to permit propensity evidence to prove the current charge, and section 1101, subdivision (a), was amended to remove such evidence from the prohibition against use of character evidence to prove conduct on a specified occasion. (Stats. 1996, ch. 261, §§ 1, 2.) Such evidence is thus admissible in the case-in-chief, subject to Evidence Code section 352.

[7]Evidence Code section 1101 provides:

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

The evidence of the prior incidents involving Pamela J. and Shawndel K. was admissible under Evidence Code section 1109. We need not consider whether the same was admissible under Evidence Code section 1101, subdivision (b). ■ The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion. (Evid. Code, §§ 352, 1109; see *People* v. *Fitch* (1997) 55 Cal.App.4th 172, 183 [63 Cal.Rptr.2d 753].)

■ "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].)

■ Evidence Code section 1109 allows the introduction of evidence of defendant's commission of prior acts of domestic violence in a criminal action charging defendant with an offense involving domestic violence.

Defendant argues that Evidence Code section 1109 and Penal Code section 13700 "refer to the classic kind of pushing, shoving, hitting, slapping, punching" and not to "a specific sexual offense such as rape." He claims that "[i]f the Legislature had desired to connect prior squabbles around the house with current rape charges it could have done so with considerably more specific language," as it did with Evidence Code section 1108. Further, defendant claims that "[t]here is no logical disposition toward committing rape based on a prior physical hassle or verbal contest between domestic partners." Defendant also asserts that the prosecutor erroneously argued that the prior incidents were the same as the current charge in that all incidents involved defendant's propensity for violence against women.

"Domestic violence" is defined as "abuse" committed against a cohabitant. (§ 13700, subd. (b).) "Abuse" is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).)

Defendant was charged with forcible rape, which is defined as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, . . . [¶] . . . [¶] (2) [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).)

The definition of domestic violence/abuse ("reasonable apprehension of imminent serious bodily injury to . . . herself") encompasses the definition of rape ("fear of immediate and unlawful bodily injury on the person"). Defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, rape is a higher level of domestic violence, a similar act of control. Defendant does not dispute that the prior acts involving Shawndel and Pamela were acts of domestic violence.

Defendant claims the trial court abused its discretion under Evidence Code section 352 in that the prior acts of domestic violence were of minimal probative value and were highly inflammatory.

We disagree. Pamela and Shawndel's testimony describing defendant's prior acts of domestic violence was no more inflammatory than A. K.'s testimony describing the rape. There was no probability of confusing the jury with the evidence of prior acts of domestic violence. The incidents were relatively recent and the testimony required but 35 pages of trial transcript. The evidence was extremely probative, showing defendant's propensity for violence against domestic partners. The prior incidents of domestic violence were not the sort to evoke an emotional bias against defendant. (See *People v. Harris* (1998) 60 Cal.App.4th 727, 737-741 [70 Cal.Rptr.2d 689].)

The trial court did not abuse its discretion in admitting the evidence of defendant's prior acts of domestic violence.

B, C*

. . . . . . . . . . . . . . . . . . . . . . . . .

II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1129.

## Disposition

The judgment is affirmed.

Davis, Acting P. J., and Morrison, J., concurred.

A petition for a rehearing was denied April 19, 1999, and appellant's petition for review by the Supreme Court was denied July 14, 1999.