Filed 11/25/13  P. v. Sanchez-Elizarraras CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FIDEL SANCHEZ-ELIZARRARAS,<br><br>    Defendant and Appellant. | F064404<br><br>(Super. Ct. No. MCR036968)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Fidel Sanchez-Elizarraras was charged, by first amended information, with the following crimes against his ex-wife: forcible rape (Pen. Code, § 261, subd. (a)(2)), committed on or about December 13, 2009 (count 1); forcible oral copulation (*id.*, § 288a, subd. (c)(2)), committed on or about December 13, 2009 (count 2); forcible sexual penetration (*id.*, § 289, subd. (a)(1)), committed on or about December 13, 2009 (count 3); forcible oral copulation (*id.*, § 288a, subd. (c)(2)), committed on or about December 10, 2009 (count 4); forcible oral copulation (*id.*, § 288a, subd. (c)(2)), committed on or about December 8, 2009 (count 5); spousal abuse with a prior conviction therefor (*id.*, § 273.5, subds. (a) & (e)), committed on or about December 14, 2009 (count 6); and false imprisonment (*id.*, § 236), committed on or about December 14, 2009 (count 7).

In 2007, defendant committed an act of domestic violence and was subsequently convicted of violating Penal Code section 273.5, subdivision (a). Evidence relating to that act was admitted in his trial on the charged offenses.

On October 4, 2010, a jury convicted defendant of counts 1, 2, 6, and 7, but acquitted him of counts 3, 4, and 5, and all lesser offenses.

Defendant appeals from his conviction. Evidence Code section 1109, subdivision (a)(1) states, in relevant part: "… in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[1] Defendant contends: (1) the trial court erred when it failed to exclude, pursuant to section 352, the evidence of the prior act, and (2) the jury should not have been instructed that the prior act could be considered

---

[1]     All further statutory references are to the Evidence Code unless otherwise indicated.

because the charges alleging sexual offenses were not crimes of domestic violence.  We disagree and affirm the judgment.

## FACTS

### I

#### PROSECUTION EVIDENCE

*The Charged Offenses*

Jane Doe and defendant were divorced, but lived together with their three children in a two-story townhouse apartment on Barnett Street in Madera.[2]

Around 7:00 p.m. on Tuesday, December 8, defendant and Jane Doe were in the master bedroom when defendant demanded oral sex.  Jane Doe told him no, but knew if she refused, he would rip off her shirt, grab her by the hair, and put his penis in her mouth.  When he put his penis in her mouth on this occasion, she tried to resist by pulling back, but he grabbed her hair "really tight" and pulled her back in to his penis.  Some days Jane Doe would shut her mouth, but if her teeth hit defendant's penis, he would get really angry and demand that she open her mouth.  She would "just do it" because otherwise, he would put her in the corner of the room, naked, and leave her there.

On Thursday, December 10, Jane Doe was in the bathroom when defendant walked in, blocking the exit, and demanded that she orally copulate him.  She told him "[n]ot right now" and tried to face the sink, but he got in back of her and she knew from past experience that she had to take off her top, kneel down in front of him, and put his penis in her mouth.  If she refused, he would pull her hair and pull her down, and it would take longer.  It was easier just to obey.  On this occasion, defendant put his penis in Jane Doe's mouth to the point it hurt and she could not breathe.  When she attempted to bite down on his penis, he pulled out, grabbed her, called her a name, and threw her against the towel rack on the wall, hurting her back.  She "got down" again, but was unable to

---

[2]      Unspecified references to dates in the statement of facts are to the year 2009.

3.

"finish him off." He masturbated to climax, then threw his ejaculate in her face and walked out.

On Friday, December 11, Jane Doe and defendant had consensual intercourse. The next day, defendant slapped her.

Around 4:00 a.m. on Sunday, December 13, Jane Doe was asleep when defendant woke her up. He was standing next to the bed and told her, "Suck my dick, bitch." She tried to start a conversation because she did not want to comply, but he pulled her hair like always. The more she tried to resist by pulling back, the more force he used. Eventually, she orally copulated him for a short time. He then pushed her so she was lying on her back on the bed. He told her to "get naked," took off the bottom of her clothes while she took off her shirt, and put his penis in her vagina. His hands were holding her wrists, and he had her hands above her head as he kissed her. When she complained that he was hurting her, he started biting her right breast. She did not want to have sex with him and tried to get up, but there was a lot of force against her body.

Jane Doe was crying while this was going on. Defendant told her to shut up, and asked if she wanted to wake the children. He then bit her left breast. He turned her over so she was face down, pushed the back of her body down with his hand, and then pulled her up by the hair. Her face was in the pillow, and every time she tried to raise up, he pushed her down again. He then put his penis in her vagina from behind. The more she tried to pull away, the more force he exerted. She kept telling him to stop, but he had her down in the pillow and she could not breathe. At some point, he put two fingers in her rectum. It hurt. He told her, "Moan bitch, just moan." She managed to roll on her side, and he "just threw [her]."

Jane Doe waited for defendant to fall asleep, then went into the bathroom, threw up, and took a shower. Later that morning, defendant acted as if nothing had happened. In their son's presence, he told her, "You know you like it," and, "All you had to do was moan."

4.

Jane Doe went to work the next day. When she came home on her afternoon break, she saw defendant walking toward Norma Avila's house. Defendant had denied he was still seeing Avila, whom he met while he and Jane Doe were separated. Jane Doe pulled over in front of Avila's house. She intended to tell defendant she was leaving him. She was upset and demanded defendant tell Avila what he had been doing to Jane Doe. Defendant told Jane Doe to shut up and go home, and they would talk there. When Jane Doe insisted that defendant tell Avila he had raped Jane Doe, defendant covered Jane Doe's mouth with his hand. Jane Doe bit him. Eventually, she drove away.[3]

Once at home, Jane Doe wanted to get some items and leave the apartment, but defendant would not let her go. They struggled, and defendant grabbed Jane Doe, wrapped his arms around her, and threw her on the kitchen table. He was on top of her and had his elbow underneath her chin, while pressing his hand against her face with a lot of force. He kept telling her to listen and let him explain, but she said no and demanded

---

[3] Jane Doe admitted there were prior incidents at which Avila was present. Jane Doe first saw defendant and Avila together on January 31. They were at a supermarket, sitting in a truck together. Jane Doe asked defendant what was going on because he and she were supposed to get back together that weekend. Jane Doe became upset with defendant, who sat in the truck and laughed at her. Jane Doe knocked on the truck window and asked him to put the window down so they could talk, but when he did not, she got back in her car. As both vehicles drove off, Jane Doe was crying, and the corner of her car went underneath defendant's truck.

On November 22, Jane Doe awoke to find defendant was not there. She drove around and saw defendant's vehicle parked at Avila's house. It was about 3:19 a.m. She angrily banged on Avila's window and told defendant to come out. Jane Doe walked into the backyard, screaming at defendant to tell Avila everything he had said about her, including that he said he would throw up after having sex with Avila.

In September or November, Jane Doe got mad and cut defendant's mattress with a knife because she realized he had been lying about just being Avila's roommate. When she told defendant what she had done, he beat her. She denied speaking derogatorily to defendant about Avila's bout with cancer.

After defendant's arrest in this case, Avila served Jane Doe with a restraining order.

that he let her go. When he kept pushing her, she managed to raise her body. He then slammed her against the wall next to the table. The pair landed on the floor, where they continued to struggle. Defendant kept asking to explain and saying he was sorry, and urging her to think about the children. They continued to argue; Jane Doe was crying, and defendant kept telling her to calm down. She tried to break free from his grasp, because he insisted he wanted to kiss her. She kept moving her face, and he kept putting his face on top of hers. She was afraid he would get her clothes off and do what he previously had done.

Jane Doe told defendant she was calming down, and he finally let go of her. He got up and stood by the door leading out of the apartment. Jane Doe started grabbing clothes and putting them in a basket, then she took the basket upstairs. Defendant followed her into the children's room, where she collected more clothes and some diapers. She grew calm, so he stepped out. She then hurried to get some things from their bedroom, but he walked in on her. When he closed the door, she started to cry and put her arms in front of herself. He had a mischievous look and refused to let her go when she told him to open the door. She did not feel she was free to leave, because he would always "push" her up by the hair and pull her back inside. She panicked, believing he was going to take off her clothes and force himself on her or make her stand naked in the corner as he normally did if she did not do what he told her. This time, however, he opened the door, told her he was just being a jackass, and stepped out of the room. She grabbed what she could, made sure the stairs were clear, grabbed the basket, and ran to the car. He came running out with a box, but she did not stop.

The next morning, Tuesday, December 15, Jane Doe's supervisor persuaded her to go to the police after seeing Jane Doe crying at work and observing bruising on her jaw line. That same day, Jane Doe gave a statement to Officer Jocelynn Beck of the Madera Police Department.

Beck found Jane Doe to be very emotional. Jane Doe said she had not previously reported what happened on December 8, 10, and 13, because she did not want defendant to get in trouble. Beck observed bruises underneath Jane Doe's chin; on her hands, wrists, and one forearm; and on her left breast. In addition, Jane Doe complained of pain in her chest and the right portion of her head and neck. Beck offered to take Jane Doe to the emergency room, but Jane Doe declined and said she would see her own doctor. She also refused to undergo a sexual assault examination, despite the fact Beck advised her to have one.[4] Beck also offered an emergency protective order. Jane Doe again declined. In Beck's experience, it is common for rape and domestic violence victims to refuse sexual assault examinations, help from Victims Services, and emergency protective orders.

The next day, Beck contacted defendant, who waived his rights and agreed to speak to her. He said he knew why Beck was there; he had been in contact with Jane Doe, who had said she was going to make a police report on how he raped her. Defendant said that on December 14, Jane Doe followed him to his girlfriend's house and they had a physical altercation. Jane Doe then left. Defendant returned to their home on Barnett, and Jane Doe arrived soon after.[5] He started to talk, but Jane Doe did not want

---

[4]    Jane Doe explained at trial that she did not want to disrobe or be touched. She finally went to the emergency room on Saturday, December 19. Her left breast was very painful and there was a discharge from the nipple. She refused a pelvic examination, and no bruises, bite marks, or swelling were noted to her breast. She saw Dr. Kenneth Royle near the end of the month. He found her to be depressed and emotionally fragile. She had no specific physical complaints, although she mentioned she had been sexually assaulted about three weeks earlier. He did not observe any external injuries, and a pelvic examination resulted in normal findings. In his experience, it is common for a sexual assault victim to wait three weeks to be examined, and for the examination to reveal no abnormal findings.

[5]    At some point, according to defendant, Jane Doe broke his television set and took some of his clothing. At trial, Jane Doe admitted breaking the television, but maintained it happened accidentally when she tripped on the power cord.

7.

to. They were in the kitchen area; Jane Doe tried to leave, but defendant grabbed her, pulled her back into the kitchen, pushed her down onto a table. They struggled, and she ended up hitting the wall. They then fell to the ground. While on the ground, they spoke for a little bit about clothing of his that she had taken, and how she needed to bring it back. She said he could follow her out to its location. Jane Doe got up and left the apartment. Defendant followed her out to her vehicle and asked her to come back inside. She followed him inside, and then went up to their room. Still wanting to talk to her, defendant followed, then shut and locked the door. He admitted wanting to intimidate her, and said he did not want her to leave because she was so upset. After a few minutes, he opened the door and went either to another portion of the apartment or to the garage to get a box. When he returned, she was gone.

Defendant acknowledged previously striking Jane Doe. He also admitted putting his hands around her neck and leaving marks in 2007. He said she reported it because she got mad at him, and he went to jail for it.

Defendant admitted there were other physical altercations between them that Jane Doe did not report. He said he backhanded her on the cheek on December 12, when she argued with him about going to a company picnic, and she then tried to scratch and slap him, and ultimately punched him. With respect to the early hours of December 13, defendant said he walked into the room at 4:00 a.m.; everything seemed to be fine, and the two of them made love. While they were making love, Jane Doe said he was hurting her, so he stopped. He said he thought she was crying, but he was not sure because he was drunk. He was not sure if she orally copulated him, although he believed she probably did because she would usually do so. He admitted forcing her to orally copulate him that week, possibly in the bathroom. He said she orally copulated him in the bathroom, the bedroom, the living room, and the kitchen. Defendant denied grabbing Jane Doe's hair when this happened, but admitted holding onto her head while she performed the act. When Beck asked if he had forced it, defendant said yes, that he "tells

8.

her to do it and she does it." He stated that was just the way they were, and she seemed to be okay with it. Defendant said their past was violent. He said they both knew they needed to change, so they agreed that when they got in an argument, they would hug each other. As a result, defendant used hugging to calm Jane Doe down.

At one point, defendant asked Beck if it was possible for a woman to rape a man. He related an incident in which Jane Doe initiated sex and had intercourse with him against his will.

Defendant told Beck that he was very confused about his relationship with Jane Doe, because sometimes she would want to have sex, while at other times she would not. When she did not want to have sex, he was able to convince her to do so. When Beck asked if, on any of these occasions when he convinced Jane Doe to have sex, Jane Doe would misinterpret it as him raping her, he replied, "Probably." He explained that because he had been violent toward her in the past, often when he went at her in an aggressive manner, she would panic and cower away from him and he would have to explain to her that he was just playing.

During the interview with Beck, defendant expressed a desire to have charges pressed against Jane Doe. He said he believed they both should go to jail for hitting the other. Beck observed scratches and a bite mark on defendant. At no point did defendant admit raping or forcibly digitally penetrating Jane Doe.

*The Uncharged Misconduct*

Prior to this series of incidents, defendant struck Jane Doe many times. On one occasion, early in 2007, when the couple was still married, the two were arguing in the kitchen. Defendant acted as if he was going to hit Jane Doe in the face, although he only struck her in the arm. She was so scared that she grabbed a knife. When defendant walked away, she put the knife down. The next thing she knew, he was in front of her. He grabbed her neck and slapped her to the floor. He got on top of her and started strangling her. She could not breathe and was close to losing consciousness. She could

9.

hear her niece and son screaming in the background. She tried to get to a telephone, but defendant took her to the bedroom and locked her in with him. He apologized, hugged her, and told her just to go to sleep with him. She wanted to get out and get help, but she could not. Defendant had a lot of guns, but he put them away and put on his jeans and a shirt. He got on the bed and told her to lie down with him, and to just stay with him while he fell asleep. She waited until she believed he was asleep, then walked out of the room and called the police. Jane Doe suffered bruises and scratches as a result of the incident, and defendant was bruised under his chin when she tried to push him away. Defendant was arrested and subsequently placed on probation for misdemeanor domestic violence.

## II

### DEFENSE EVIDENCE

Norma Avila was defendant's girlfriend at the time of trial. She met defendant in June 2008, and their relationship was sexual from that time through defendant's arrest on December 16. During 2009, they lived together until September, when defendant got his own apartment. Sometime later, defendant told Avila that Jane Doe had moved in with him, but that they were just together as roommates for the children.

Avila had several confrontations with Jane Doe. The first occurred on January 31. Avila and defendant had just come out of a store and were sitting in defendant's truck with Avila's son, when defendant said his ex-wife was coming down the road. Jane Doe parked her car in front of defendant's truck, and then started banging on the window on Avila's side. She tried to open the door, and said to Avila, "Fucking bitch, get out of the car so I can kick your ass." Avila's son started crying, and defendant drove out of the parking lot. When he stopped for a red light, Jane Doe struck his truck with her car. The collision did not cause any damage.

Around the first weekend in November, defendant was at Avila's house when Jane Doe started ringing the doorbell and banging on the door, and yelling at Avila to come

10.

outside so Jane Doe could talk to her. Avila did not open the door, and the banging continued for about five minutes.

On November 22, defendant and Avila returned from a party at 3:00 a.m. They were getting ready for bed when Jane Doe started ringing the doorbell and jerking at the doorknob. She was screaming obscenities and demanding that they come out, as she said she wanted to talk to them. She then moved to the kitchen window and banged on it. Avila and defendant started getting dressed, and Avila called the police. Meanwhile, Jane Doe had moved to the window in Avila's backyard and was yelling, "You fucking bitch, that's why your ass got cancer," and that she hoped Avila, a cancer survivor, died.

Around 3:00 p.m. on December 14, Avila saw defendant walking up to her house, then Jane Doe drove up. She demanded to know what defendant was doing there, and she started hitting him with both hands. Defendant did not hit her back, but just kept telling her to calm down. Ultimately, Jane Doe made a U-turn, came back and almost hit defendant with the car, and told him she was going to ruin his life. When defendant came inside, Avila wanted to call 911, but he kept saying that he had to go. He was bleeding from a bite mark on the palm of his hand, and he also had some scratches.

Defendant testified that other than his misdemeanor conviction for domestic violence in 2007, his only criminal record consisted of a traffic ticket. He and Jane Doe married on November 27, 1998. At first, their relationship was fine. In 2007, however, he and Jane Doe were arguing, and he kept asking her to stop. Finally, he got up from the couch, grabbed her left arm, and told her to just stop. He then turned around, and she picked up a knife and tried to slash him. He grabbed her hand with one hand and her neck with the other, and threw her to the ground. He got the knife out of her hand, but while she was on the ground, she grabbed him by the neck and he let go of her. He pled guilty because of his reaction to the action that she took, although he believed he was just acting in self-defense.

11.

On Tuesday, December 8, defendant got off work around 3:00 p.m. and went to Avila's house, as he did every Tuesday. He spent the entire evening with her, and did not force Jane Doe to orally copulate him that day. On Wednesdays, Jane Doe habitually came home on her lunch break and had sexual intercourse with defendant. Thursday, December 10, was one of defendant's days off work. He was at the apartment that day, rather than at Avila's home. He did not force Jane Doe to orally copulate him that day.

On Saturday, December 12, defendant had plans to go to a company function in Fresno. Jane Doe kept saying he was going to go "with that bitch." Despite defendant repeatedly telling her to stop, Jane Doe continued on in this manner for 10 or 15 minutes. Finally, defendant turned from where he was playing a video game. Although he did not intend to strike her, she was close to him and he backhanded her on the cheek. He apologized and went back to his game, whereupon she punched him behind the ear. He told her just to let it be, and that was the end of the incident.

On Sunday, December 13, defendant and Jane Doe were together, but defendant did not rape her or penetrate her with his fingers. Defendant arrived home between 4:45 and 5:00 a.m., went upstairs to go to bed, and started kissing Jane Doe. They then started having sex. Jane Doe never said no, although, when he turned her around and "had her doggy style," she did tell him to stop because he was hurting her. He stopped and went to sleep. When he woke, he hugged and kissed her, then got in the shower. He told her that he was going over to his mother's house, and to meet him there whenever she got ready. They were at his mother's house until around 6:00 p.m. That night, when defendant was getting ready for bed, Jane Doe followed him upstairs. Their daughter also came upstairs, but Jane Doe told her to get out because she wanted to be alone with defendant. Jane Doe then got into bed with defendant. He started hugging and kissing her, and they had intercourse. The purported injury to Jane Doe's breast was actually a hickey.

On Monday, December 14, defendant was on the sidewalk in front of Avila's house when Jane Doe came over. After their altercation, defendant returned to the

12.

apartment to find his television, Xbox, movies, and some clothes were missing. Defendant was gathering up his things, because Jane Doe had told him to move out, when Jane Doe came in. Defendant asked if he could talk to her, but she said no. When he said he just wanted to tell her what happened between Avila and him, Jane Doe punched him in the chest. He grabbed her to stop her, and told her to calm down. They started struggling. The struggle moved from the living room to the kitchen. They bumped into the table. Jane Doe was on her back; she grabbed defendant by the neck, choking him, and he put up his hand to break her hold. When he took a step back, she tried to kick and scratch him. He grabbed her and hugged her, and they bumped into the wall and fell to the ground. Jane Doe landed on top of defendant. Defendant told her to stop.

After Jane Doe calmed down, they talked a little, and then sat up. Defendant asked if she would hug him, but she said no. He asked for a kiss and she again refused. He then asked her to stay with him. She said she would only do so if he went to Avila's house and told Avila that Avila was a bitch who was nothing to him and that he loved Jane Doe, not Avila. Defendant did not respond. Jane Doe then got up, walked outside, got into her vehicle, and said she was leaving. Defendant asked her to just bring back his stuff. She told him to follow her and he could grab it himself. She then walked back inside the apartment. Defendant followed her upstairs, closed and locked the door, and stood in front of the door with his hands on his hips to let her know he was not going to do anything to her. Jane Doe asked if defendant hated her; he said yes, but then chuckled and said he was just being a jerk. He then walked out to get the dress she had worn for their wedding. He put it in a box. When he came back to give it to her, she was already leaving.

During the course of their relationship, Jane Doe sometimes struck defendant without provocation. In June or July, when she found out defendant was taking care of Avila's son, Jane Doe refused to allow defendant to see his own children. On October 18, a day after she caught defendant at Avila's house, she told him to move out

of the apartment.  When he gathered up his things and started walking out, she slapped his face a couple of times.  Each time, he grabbed her and kissed her cheek.  He then got in his truck, and she walked around it and scratched it with a key.

Around the beginning of November, defendant told Jane Doe that Avila might be pregnant with his baby.  Jane Doe responded by slapping his face, hammering her fists on his chest, and calling him names.  He merely told her to calm down.  About five or six days later, defendant was cooking shrimp for the family.  Jane Doe objected to him putting salt on the shrimp, and suggested he used to do the same thing for "that bitch," meaning Avila.  Defendant said that was not the only thing he would do for her — that he would also clean for her — whereupon Jane Doe got upset and slapped his face.

On November 22, when Jane Doe found defendant at Avila's house, there was an altercation.  Defendant went home and, when Jane Doe came in later, she immediately started hitting him and ripped off his shirt.  Defendant never made derogatory comments about Avila, but Jane Doe called Avila names outside Avila's presence.  Defendant admitted telling Beck that he and Jane Doe had a violent past; sometimes Jane Doe would come at him for no reason, and he would have to "come back at her" in an aggressive way — meaning tell her to stop with an angry expression or loud voice — to get her to stop.

Sometimes defendant called Jane Doe names, such as "bitch," during their sexual activity, but that was how they "sex played."  None of the acts were ever forced.  Everything Jane Doe did, she did of her own free will.  Defendant believed she was making up the charges because he was cheating on her.

## DISCUSSION

In the trial court, defendant moved, in limine, to exclude evidence of the 2007 incident of domestic violence under section 352.  He argued propensity evidence had no probative value, while admission of the evidence would cause confusion, result in undue consumption of time, and be highly prejudicial.  The People countered by asking to have

14.

the evidence admitted under section 1109, subdivision (a)(1). The prosecutor conceded admission of the evidence would consume some time, but argued the prior incident was highly probative and its admission would not result in confusion. At the conclusion of argument, the trial court stated it had weighed the prejudicial value of the evidence against its probative value and found the evidence admissible.[6]

The evidence adduced at trial concerning the 2007 incident is set out in the statement of facts, *ante*. At the People's request, the trial court instructed the jury with CALCRIM No. 852 (Evidence of Uncharged Domestic Violence). In pertinent part, jurors were told:

> "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit domestic violence, and, based on that decision, also conclude that the defendant was likely to commit, and did commit, rape, forced oral copulation, battery, felony false imprisonment, misdemeanor false imprisonment, assault, battery against a spouse, former spouse or cohabitant, and sexual penetration by a foreign or unknown object, as charged here."

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. [Citations.]" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; see § 1101, subd. (a).) Section 1108, which concerns sexual offenses, and section 1109, which concerns, inter alia, domestic violence, are specific exceptions to the general rule. (*People v. Villatoro*, *supra*, at p. 1159.)[7]

---

[6]    The trial court also permitted the defense to elicit evidence of prior incidents by Jane Doe of alleged physical abuse against defendant.

[7]    Because sections 1108 and 1109 are "'complementary portions of the same statutory scheme'" and "'virtually identical,'" "cases which have interpreted section 1108 have been relied upon to resolve similar issues involving section 1109. [Citations.]" (*People v. James* (2010) 191 Cal.App.4th 478, 482, fn. 2.)

15.

With exceptions not pertinent here, subdivision (a)(1) of section 1109 provides: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." The trial court's discretion to exclude the propensity evidence under section 352 saves section 1109 from a due process challenge. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Johnson* (2000) 77 Cal.App.4th 410, 418-420; cf. *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

Defendant claims the trial court erred when it failed to exclude, pursuant to section 352, the evidence of the prior act, and, because the charges alleging sexual offenses were not crimes of domestic violence, the jury should not have been instructed that the prior act could be considered.

We first consider whether the sexual offenses with which defendant was charged constituted offenses "involving domestic violence" within the meaning of section 1109, subdivision (a)(1). Subdivision (d)(3) of section 1109 provides: "'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."

Subdivision (a) of Penal Code section 13700 defines "'[a]buse'" as "intentionally or recklessly causing or attempting to cause bodily injury, *or* placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Italics added.) Subdivision (b) of the statute defines "'[d]omestic violence'" as, inter alia, "abuse committed against an adult … who is a … former spouse, cohabitant, … or person with whom the suspect has had a child …."

16.

Defendant essentially contends the sexual offenses charged here did not constitute "'[a]buse'" within the meaning of Penal Code section 13700, subdivision (a), and so he was not accused of "an offense involving domestic violence" as required by section 1109, subdivision (a)(1). Consequently, the argument runs, the trial court erred by instructing jurors that they could use the evidence of the 2007 incident in determining defendant's guilt of the charged sex offenses. We disagree.

In *People v. Poplar* (1999) 70 Cal.App.4th 1129 (*Poplar*), the defendant was convicted of raping the woman with whom he was living. On appeal, he asserted the trial court erred by admitting evidence of uncharged incidents of domestic violence against two former girlfriends. (*Id*. at pp. 1131-1132, 1135-1137.) The defendant argued, in pertinent part, that Penal Code section 13700 made no mention of rape; hence, the evidence was inadmissible under section 1109. (*Poplar*, *supra*, at pp. 1137, 1138.) The Court of Appeal rejected the claim, stating: "The definition of domestic violence/abuse [in Penal Code section 13700] ('reasonable apprehension of imminent serious bodily injury to … herself') encompasses the definition of rape [in Penal Code section 261, subdivision (a)(2)] ('fear of immediate and unlawful bodily injury on the person'). Defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, rape is a higher level of domestic violence, a similar act of control." (*Poplar*, *supra*, at p. 1139; accord, *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1332.)

This court has previously discussed *Poplar* with approval. (See *People v. Brown, supra,* 192 Cal.App.4th at p. 1236.) Nevertheless, defendant says *Poplar*'s reasoning is flawed, because domestic violence is defined in section 1109 by reference to Penal Code section 13700, which in turn defines abuse with reference to bodily injury; and rape and oral copulation are often committed without physical injury. Under the plain language of subdivision (a) of Penal Code section 13700, however, actual injury is not required.

This court's opinion in *People v. James*, *supra*, 191 Cal.App.4th 478, is instructive. In that case, the defendant was convicted of first degree burglary after he

17.

broke down the door of a woman with whom he previously lived.  The issue before us on appeal was whether the trial court erred in admitting evidence of a prior act of domestic violence against one of the defendant's former girlfriends.  (*Id*. at p. 480.)  We agreed with the defendant that section 1109 only "allows the admission of prior acts of domestic violence when 'the defendant is accused of an offense involving domestic violence.'" (*People v. James*, *supra*, at p. 482.)  However, we concluded that "[a]lthough burglary is not, in every instance, an offense involving domestic violence, under the facts of [that] case the crime of burglary was an offense 'involving domestic violence.'  Defendant broke down the door of K.M., a person with whom he had a dating relationship, and repeatedly made threatening remarks towards her.  His actions placed K.M. in reasonable apprehension of imminent serious bodily injury to herself.  Thus, his actions, which resulted in his conviction for burglary, involved domestic violence." (*Id*. at p. 483.)

We need not decide whether sexual assault of a former spouse, cohabitant, or person with whom the perpetrator has had a child will always bring a defendant within the definition set forth in Penal Code section 13700, subdivision (b) and, accordingly, subdivision (d)(3) of section 1109.  It is enough to say that under the circumstances of the present case, the sexual offenses defendant was charged with perpetrating against Jane Doe constituted "offense[s] involving domestic violence" within the meaning of section 1109, subdivision (a)(1).

Moreover, even if we were to find Penal Code section 13700 inapplicable here, section 1109, subdivision (d)(3) also defines "'domestic violence'" with reference to section 6211 of the Family Code.  Family Code section 6211 defines domestic violence to require abuse; subdivision (b) of Family Code section 6203 defines abuse to include sexual assault.  (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144.)  "Section 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition.  [Citation.]"  (*Ibid.*)

Assuming the trial court properly admitted evidence of the 2007 incident under section 352, it follows the court did not err in instructing jurors, pursuant to CALCRIM No. 852, that they could consider the evidence with respect to the charged sexual offenses.[8] Accordingly, we now examine admission of the evidence under section 352. That statute provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"'When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled. [Citation.]'" (*People v. Hart* (1999) 20 Cal.4th 546, 606.) "The governing test … evaluates the risk of '*undue*' prejudice, that is, '"evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,"' not the prejudice 'that naturally flows from relevant, highly probative evidence.' [Citations.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 925, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) A trial court enjoys broad discretion in assessing probative value versus prejudicial effect, and its exercise of that discretion will not be disturbed on appeal except on a showing the court exceeded the bounds of reason, all of the circumstances being considered. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

"In exercising this discretion as to a sexual offense [and, by parity of reasoning, an offense involving domestic violence], 'trial judges must consider such factors as its

---

[8] CALCRIM No. 852 has been held to be a correct statement of law. (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251-252.)

nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 61; see also *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119; *People v. Harris* (1998) 60 Cal.App.4th 727, 737-741.) "Evidence of previous criminal history inevitably has some prejudicial effect. But under section 1108, this circumstance alone is no reason to exclude it. '[S]ection 1108 affects the practical operation of [Evidence Code] section 352 balancing "'because admission and consideration of evidence of other sexual offenses to show character or disposition [is] no longer treated as intrinsically prejudicial or impermissible.… As with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission.*'" [Citation.]' [Citation.]" (*People v. Loy, supra,* 52 Cal.4th at p. 62.)

The foregoing reasoning is equally applicable to section 1109 evidence, and "[n]othing about the evidence here required the trial court to find the presumption in favor of admissibility had been overcome." (*People v. Loy, supra,* 52 Cal.4th at p. 62.) Since the charged and uncharged acts involved the same victim, the prior domestic violence was highly probative of the issues in this case, particularly whether Jane Doe consented to any or all the charged sex offenses. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1307, 1316; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029.) The 2007 incident was not unduly inflammatory — certainly it was no more egregious than the charged offenses — and it posed no danger of confusing the jury. (See *People v. Jennings, supra,* 81 Cal.App.4th at p. 1315; *Poplar, supra*, 70 Cal.App.4th at p. 1139.) Nor was there any likelihood jurors would seek to punish defendant for the prior offense,

given the fact they learned defendant had been convicted as a result of the incident. (See *People v. Loy, supra,* 52 Cal.4th at p. 61; *People v. Jennings, supra,* 81 Cal.App.4th at p. 1315.) The 2007 incident was not remote in time from the charged offenses (see *People v. Loy, supra,* 52 Cal.4th at p. 62; *Poplar*, *supra*, 70 Cal.App.4th at p. 1139); moreover, that the majority of the witnesses at trial may have been questioned about the events of 2007 does not mean the trial court was compelled to exclude the evidence as an undue consumption of time. (See *People v. Escudero* (2010) 183 Cal.App.4th 302, 312.)

The trial court acted well within its discretion in admitting the challenged evidence.[9] Since that evidence was admitted for a permissible purpose and its exclusion was not compelled by section 352, defendant's due process rights were not violated. (See, e.g., *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Foster* (2010) 50 Cal.4th 1301, 1335; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384.)

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
FRANSON, J.

_____

**9** The fact jurors acquitted defendant of some of the sex charges shows they considered the evidence dispassionately. (See *People v. Smith* (2003) 30 Cal.4th 581, 612-613.)

21.