Filed 4/9/14  P. v. Duarte CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072410 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F02145) |
| v. | |
| STEVEN ARTHUR DUARTE, | |
| Defendant and Appellant. | |

Defendant Steven Arthur Duarte shot his girlfriend, Serena Williams, in the head at close range, killing her.  He had two reasons for killing her:  one, he was sick of her disrespecting him; and two, he believed she had given him HIV or AIDS.  At trial, among other things, the jury heard evidence of defendant's prior acts of domestic violence and defendant's confessions to three jail mates.  A jury found him guilty of first degree murder and being a felon in possession of a firearm.  The court found true a number of enhancements, including that he had previously been convicted of murder, and sentenced him to a term that included life in prison without the possibility of parole.

1

Defendant appeals, contending the trial court erred in admitting the prior acts of domestic violence because the charged crime of murder was not, on its face, an offense involving domestic violence; (2) the court abused its discretion in admitting the prior acts of domestic violence under Evidence Code section 352; and (3) the court abused its discretion in denying defendant's request, made at the time of sentencing, to represent himself to research and later file a new trial motion claiming ineffective assistance of counsel. Disagreeing with these contentions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Facts Leading Up To The Murder And The Murder*

Defendant and Williams had an on-and-off relationship that began in 2004. In about 2007, defendant lived with Williams for about two to four months in a duplex that was also being shared with roommates Paul Olney and Robert Heyer. Defendant and Williams fought a lot and some of those arguments involved jealousy. Defendant learned he was HIV positive in April 2007. Defendant believed Williams had given him the virus or AIDS, and they fought about that, too.

In August 2007, defendant moved in with roommate Johnny DiMatteo. According to DiMatteo, defendant "always seemed hateful to [Williams]." In February 2008, defendant told DiMatteo he had HIV and said Williams gave it to him. Defendant told him that Williams did not seem to care that she had HIV, and did not care that he had HIV, he was "shattered" by those things, and he called her names like "cunt" and a "piece of ass."

March 18, 2008, was the day Williams was murdered. At that time, defendant and Williams were "kind of in the middle of breaking up." At 3 p.m., Heyer started his work shift at the Alano Club (which is a clean and sober place where addicts socialize), and Williams was there with her siblings and friends laughing and talking. Defendant came by a few minutes later and tried to talk with Williams, but she did not want to listen to

2

him. He then found Heyer in the back room and said that "[h]e just had enough of [Williams] humiliating him and laughing at him," and he was sick of her and he was not going to be humiliated by her anymore.[1]

Around 4:30 or 5:30 p.m., defendant went back to the house he was sharing with DiMatteo and asked DiMatteo to borrow a pistol to defend his nephew who had been accosted by gang bangers. DiMatteo retrieved his .22-caliber semiautomatic handgun from his son's nearby house and returned home between 7:30 and 8:00 p.m. DiMatteo put the gun on the kitchen table and defendant picked it up and left.

At 11:11 p.m., Williams's cousin, Denise Veach, who lived two doors down from Williams, heard a bang that sounded like a small caliber gun going off in the direction of Williams's duplex. She looked out her window and saw somebody running. Three or four days earlier, she had overheard defendant telling Williams, "I am going to blow your brains out."[2]

Back at DiMatteo's home, DiMatteo had fallen asleep in front of the television. He was awakened by defendant, who asked DiMatteo for some gas money and told DiMatteo to clean up his "mess," referring to the marijuana that DiMatteo was growing. DiMatteo knew that something must have gone terribly wrong for defendant to ask him for money and tell him to clean up his mess.

Around 11:55 p.m., Heyer returned to the duplex he shared with Williams. He found her dead body draped over the stove and called 911. According to an autopsy, Williams's head had been slammed against the stove and she had been fatally shot in the

---

[1] He had also complained to others that he was sick of Williams flirting with other men, ignoring him and disrespecting him, and he appeared jealous that she had just recently gotten a tattoo acknowledging her relationship with an ex-fiancé who had recently died.

[2] However, Veach did not tell the officer investigating the shooting about defendant's earlier comments.

head. There was blood in her airways and lungs, which meant she did not die instantly; it probably took "many seconds."

Defendant was arrested for murdering Williams. While awaiting trial, defendant confessed to three others in jail that he had shot Williams.

Defendant testified at trial and denied killing Williams. He also testified that he had never confessed to the killings and that his jail mates were lying.

B

*Defendant's Prior Acts Of Domestic Violence*

Katherine Leon was defendant's ex-wife, with whom he had a child in 1974 and married in 1975. In 1974 or 1975, defendant overheard her talking with his brother about what defendant perceived to be an inappropriate sexual matter (the brother's sexual relationship with the brother's girlfriend). Defendant responded by hitting Leon on the head and knocking her out. They divorced in 1979.

Theresa Hodges was defendant's live-in girlfriend, whom he married in 1996. In April 1995, defendant slapped her, tried to smother her, chased her with a gun and shot it near her feet because he thought she had cheated on him and lied to him. In May 1995, defendant grabbed her by the hair, punched her in the jaw, and fondled her vagina, because he was jealous and thought she had been having sex with someone else. In 1998, he put her in a choke hold, put his hand over her mouth, and injected heroin into her arm because he thought she had cheated on him. They divorced in 2001.

Patricia Sulpizio was defendant's intimate friend with whom he cohabitated. In 2007, defendant was having what Sulpizio described as a temper tantrum, so she "snicker[ed]" at him. In return, he called her names, including slut, whore, and cunt, put his chest up against hers, and then threw her down onto the bed.

Defendant testified at trial that the testimony of these women was exaggerated or embellished.

4

DISCUSSION

I

*The Murder Here Was An Offense Involving Domestic Violence*

Defendant contends the trial court erred in admitting his prior acts of domestic violence because the charged crime of murder was not "an offense involving domestic violence" on its face. (Evid. Code, § 1109, subd. (a)(1) ["in a criminal action in which the defendant *is accused of an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352", italics added].) We disagree, applying the definitions of these terms as explained in Evidence Code section 1109, subdivision (a) and agreeing with a case from the Court of Appeal, Fifth Appellate District, *People v. Brown* (2011) 192 Cal.App.4th 1222 (*Brown*), holding that murder was a crime of domestic violence for the purposes of Evidence Code section 1109.

A

*Definitions Pertaining To Evidence Code Section 1109 And Domestic Violence*

Evidence Code section 1109 does not include a list of "offense[s] involving domestic violence."[3] Instead, Evidence Code section 1109 incorporates the definition of domestic violence in Penal Code section 13700 and, under certain circumstances, the broader definition in Family Code section 6211. Specifically, " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to [Penal Code] Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set

---

[3]    In contrast, Evidence Code section 1108, which permits evidence of other sexual offenses when a defendant is "accused of a sexual offense" defines " '[s]exual offense' " by listing specified offenses and categories of conduct. (Evid. Code, § 1108, subds. (a), (d)(1)(A)-(F).)

forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).)

Penal Code section 13700 defines "domestic violence" as "abuse committed against an adult or a minor who is a . . . cohabitant . . . or person with whom the suspect . . . is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b).)

Family Code section 6211 defines " '[d]omestic violence' " as "abuse perpetrated against any of the following persons: [¶] (a) A spouse or former spouse. [¶] (b) A cohabitant or former cohabitant, as defined in [Family Code] Section 6209. [¶] (c) A person with whom the respondent is having or has had a dating or engagement relationship. . . ."

" 'Abuse' " is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

B

*The Holding In Brown Applies Here*

In *Brown*, the Court of Appeal, Fifth Appellate District, held that the circumstances of a crime may establish it is an offense involving domestic violence, even if domestic violence is not an essential element of the crime. (*Brown*, *supra*, 192 Cal.App.4th at pp. 1235, 1237.) The defendant there (as here) was charged with and convicted of first degree murder in the homicide of his former girlfriend. (*Brown*, at p. 1224.) The trial court admitted evidence of the defendant's prior acts of domestic violence under Evidence Code section 1109, holding that murder was an offense " 'involving domestic violence.' " (*Brown*, at pp. 1230-1231.) The Fifth Appellate District affirmed, stating: "Given the legislative history and the language of [Evidence Code] section 1109, we agree with the trial court's observation in this case that murder is 'the ultimate form of domestic violence,' and that defendant's prior acts of domestic

6

violence were admissible based on the nature and circumstances of his relationship with and conduct toward [his former girlfriend]. Defendant was charged with first degree murder based on strangling [her] after a lengthy period in which he tried to intimidate her because she chose to break up with him. He was clearly 'accused of an offense involving domestic violence' within the meaning of [Evidence Code] section 1109." (*Brown*, at p. 1237.)

The *Brown* court rejected the defendant's argument that prior acts of domestic violence are not admissible in a murder prosecution because murder is not listed as a crime involving domestic violence in either Evidence Code section 1109, Penal Code section 13700, or Family Code section 6211. (*Brown*, *supra*, 192 Cal.App.4th at pp. 1237-1240.) While acknowledging that courts have described Evidence Code sections 1108 and 1109 as " 'virtually identical,' " the *Brown* court noted there were "important statutory distinctions relative to defendant's definitional arguments in this case." (*Brown*, at p. 1238.) While Evidence Code section 1108 permits the introduction of propensity evidence when the defendant " 'is accused of a sexual offense' " and defines that term in part with a list of enumerated offenses, Evidence Code section 1109 provides for the admission of propensity evidence when the defendant " 'is accused of an offense involving domestic violence,' " and does not define that term with a specified list of offenses. (*Brown*, at p. 1240.)

We find *Brown*'s reasoning persuasive and apply it here. Defendant's prior acts of domestic violence were admissible because the evidence established the charged murder involved domestic violence. Penal Code section 13700 defines " 'domestic violence' " as "abuse committed against an adult or a minor who is a . . . cohabitant . . . or person with whom the suspect . . . is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b).) Williams was a person with whom defendant "had a dating . . . relationship." (Pen. Code, § 13700, subd. (b).) Defendant " 'abuse[d]' " her by "intentionally or recklessly" causing her "bodily injury, or placing [her] in reasonable

7

apprehension of imminent serious bodily injury" (Pen. Code, §13700, subd. (a)) when he slammed her head against the stove and fatally shot her in the head.

C

*Defendant's Remaining Arguments Pertaining*

*To Evidence Code Section 1109 Beyond Brown*

Finally, we address two remaining issues that defendant raises beyond *Brown*.

One, as support for defendant's argument that the phrase "offense involving domestic violence" is restricted to crimes involving domestic violence "on the face of [their] elements or as implied by [their] statutory definition[s]," defendant rhetorically asks why would not the Legislature have simply stated, "In a criminal action in which the defendant is accused of an offense, *the commission of which involves domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible . . . ?" One obvious reason is the Legislature wanted to be less wordy. The phrase "an offense involving domestic violence" is more concise than "an offense, the commission of which involves domestic violence." Importantly, however, the Legislature did not use the term "domestic violence offense," which would have tended to support defendant's restrictive, definitional elements approach. Thus, contrary to defendant's position, the plain language of Evidence Code section 1109 does not support his restrictive interpretation.

And two, as additional support for his position, defendant notes that Evidence Code section 1109 incorporates the definition of "domestic violence" from other code sections  and argues that the broader definition of "domestic violence" in Family Code section 6211 can apply only to propensity evidence of domestic violence and not to the charged  "offense involving domestic violence." He reaches this conclusion by arguing that the reference in Evidence Code section 1109, subdivision (d)(3) to a five-year limit and a hearing under Evidence Code section 352 "makes this [conclusion] clear." To illustrate, he argues that " 'stalking' apparently can constitute an act admissible in a

8

domestic violence prosecution, but cannot constitute a charged 'offense involving domestic violence.' "

Defendant is wrong, because if the stalking "place[d] another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another" (Pen. Code, § 13700, subd. (a)), then that crime could constitute a charged "offense involving domestic violence" under Evidence Code section 1109.

D

*Conclusion*

Following *Brown* and rejecting defendant's additional arguments, we conclude defendant's murder of Williams was an "offense involving domestic violence" under Evidence Code section 1109, which allowed the People to introduce his prior acts of domestic violence subject to Evidence Code section 352. We turn there next.

II

*The Court Did Not Abuse Its Discretion Under Evidence Code Section 352*
*When It Admitted The Prior Acts Of Domestic Violence*

Defendant contends that even if the foundational requirement of a domestic violence charge was satisfied, the trial court erred in admitting the prior acts of domestic violence under Evidence Code section 352, claiming the error was of constitutional magnitude. As we explain, there was no abuse, even for the acts that occurred 10 years before Williams's murder.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The court's discretion under Evidence Code section 352 is broad and its exercise of discretion will not be disturbed except if it resulted in a " 'manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

9

Here, "[t]he common factors in all [the prior acts] strongly suggest defendant has a problem with anger management, specifically with regard to female intimate partners, and specifically when he feels rejected or challenged by such a partner." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 533.)

For Leon (who was defendant's ex-wife), defendant's violence (hitting her on the head, knocking her out) occurred sometime in 1974 or 1975 when he overheard her talking with his brother about what defendant perceived to be an inappropriate sexual matter.

For Hodges (who was defendant's live-in girlfriend and later his wife), defendant's violence occurred when he: (1) slapped her, tried to smother her, chased her with a gun and shot it near her feet in April 1995, because he thought she had cheated on him and lied to him; (2) grabbed her by the hair, punched her in the jaw, and fondled her vagina in May 1995, because he was jealous and thought she had been having sex with someone else; and (3) put her in a choke hold and injected heroin into her arm in 1998 because he thought she had cheated on him.

For Sulpizio (with whom defendant had a friendship and sexual relationship that included cohabitation), defendant's violence arose in 2007 when defendant was having a temper tantrum, so she snickered at him and he called her names, put his chest up against hers, and then threw her down onto the bed.

These prior acts showed that, just like with the current murder, defendant resorted to domestic violence as a means of exercising control over the relationship when angered due to perceived slights, jealousy, or rejection from his partner.

Additionally, the prior acts evidence would not unduly confuse the issues. The past acts of violence were separated by time and involved different victims and witnesses. And there was no deception or confusion engendered by the arguments of counsel.

Finally, in terms of the probative value, the presentation of the prior acts evidence was not unduly time consuming. Leon's testimony was four pages. Hodges's testimony

was 21 pages. And Sulpizio's testimony was 11 pages. (See *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139 [35 pages of testimony on prior acts was not prejudicial].) In all, there were 36 pages of prior acts testimony, compared with approximately 1,000 pages of other trial testimony.

As for prejudice, the prior acts were not more inflammatory than the current murder which, as we have noted, has been described as " 'the ultimate form of domestic violence.' " (*Brown*, *supra*, 192 Cal.App.4th at p. 1237.) Defendant claims, though, that the incident where he injected Hodges with heroin was "perverse and monstrous, far in excess of any cognitive probative value contained in it as domestic violence." However, as the prosecutor aptly pointed out when arguing for the admission of this evidence: "That is a pretty powerful example of his domination over her" and is "yet another example of his exertion of power and control over [women]." And, as this court has stated in another case when discussing that the prejudice Evidence Code section 352 is designed to avoid is not the prejudice that flows from relevant, highly probative evidence: "Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)

Finally, as to the remoteness of some of the prior acts (specifically, the 1974 or 1975 incident involving Leon and the 1995 incidents involving Hodges), defendant notes that Evidence Code section 1109, subdivision (e) specifically restricts admissibility of remote prior domestic violence: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

The problem with defendant's argument is, as the trial court found, defendant's criminality did not abate with time. Instead, it has continued with time, culminating with

11

murder. Thus, during the short intervals that defendant was not incarcerated,[4] he has continuously beat up women to exercise dominion and control over them. His earlier domestic violence is a trend that continued up until the current murder and there was no cogent reason the trial court should have excluded the earlier crime as remote, given defendant's history.

In conclusion, given the factors we have discussed above, the trial court was well within its discretion to admit the prior acts of domestic violence.

III

*The Trial Court Did Not Abuse Its Discretion In Denying Defendant's*

*Untimely Request To Discharge Defense Counsel And Represent Himself*

One month after the jury had found defendant guilty of murder, on the day set for sentencing, defense counsel told the court that defendant wanted to discharge him and represent himself for the purpose of researching and filing a motion for new trial based on ineffective assistance of counsel. The trial court denied the motion.

A motion to represent oneself made on the day of the sentencing is untimely and thus whether to grant it is within the trial court's discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 452-455, fn. 39.) In exercising its discretion to decide whether to grant an untimely motion, "the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required." (*People v. Windham* (1977) 19 Cal.3d 121, 128.) There was no abuse of discretion.

The trial court denied the motion, reasoning it was not timely, not made in good faith because it was made for the purpose of delay, and that the ineffective assistance of

---

**4**    Defendant was incarcerated from 1975 to 1981, 1982 through 1984, 1985 through 1987, 1988, 1995 through 2001, and from 2008 because of the current murder.

counsel arguments that defendant wanted to raise were unmeritorious, so any eventual motion for new trial would have been denied.

As to the ineffective assistance claims, defendant on appeal focuses on three, all of which were discussed by the trial court.

The first was trial counsel's failure to present evidence of defendant's cell phone records showing text messages between him and Williams in the days before her murder, which defendant claimed would show a lack of animosity between them.

The second was cell phone records demonstrating where defendant was at the time of the murder, which he claims would have impeached DiMatteo's testimony about what time he left DiMatteo's home with the gun and what time he returned.

The record shows that trial counsel's decision not to admit this evidence was tactical. Specifically, in response to these two allegations of ineffective assistance, counsel stated, "There was other information that I received . . . in those cell phone records earlier in the evening that caused me concern, and I don't want to elaborate beyond that; but it was because of that information that I decided that I would not use the cell phone records."

The third was failing to call Veach's daughter, Jolene Gerber, as a witness to testify that defendant was not in the area a couple of days before the murder, which would have impeached Veach's testimony that Veach overheard defendant threaten to blow Williams's brains out. However, as the trial court pointed out, Veach's testimony already had been impeached by one of the investigating officers.

Based on the lack of merit to these claims and the fact that defendant made his motion to represent himself on the day of sentencing, coupled with a continuance request, the court could logically infer that the motion and continuance request were being made for purpose of delay. Thus, the trial court did not abuse its discretion in denying defendant's motion.

13

DISPOSITION

The judgment is affirmed.

                                        _____ROBIE_____, J.

We concur:

____RAYE_____, P. J.

____MAURO_____, J.