Filed 12/9/15  P. v. Mauries CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B259658 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA132220) |
| v. | |
| DAVID MAURIES, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. John A. Torribio, Judge.  Affirmed.

Jerome J. Haig, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant David Mauries was convicted of one count of inflicting corporal injury on a cohabitant.  The jury also found true the special allegation that defendant inflicted great bodily injury on the victim, his girlfriend.  Defendant's sole contention is that the trial court erred in admitting, pursuant to Evidence Code section 1109, evidence that he engaged in a prior act of domestic violence against his former wife.  We conclude the trial acted within its broad discretion to admit the prior conduct evidence, and therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged by information with one count of corporal injury to a cohabitant.  (Pen. Code, § 273.5, subd. (a).)  It was further alleged defendant personally inflicted great bodily injury during the commission of the offense (§ 12022.7, subd. (e)), and that he had suffered a prior conviction for a serious felony within the meaning of the "Three Strikes" law for which he served a prior prison term (§§ 667, subds. (a)-(i), 667.5, subd. (b), 1170.12, subds. (a)-(d)).  Defendant pled not guilty and denied the special allegations.

The charges arose from an incident that occurred on October 6, 2013.  The evidence at trial, viewed in the light most favorable to the judgment, revealed the following.

Sometime in early 2012, defendant and Rhiannon S.[1] started dating.  They dated for about a year and a half, and during that time, defendant would "on and off" live at her apartment in Downey.  By October 2013, she and defendant had "broken up" but were talking about getting back together and were going out like they were "still together."  Defendant still kept some of his things in her apartment.  Rhiannon conceded one of the reasons they often broke up was that defendant wanted her to stop drinking so much.

On the morning of October 6, 2013, defendant and Rhiannon had been spending a nice weekend together without fighting.  Defendant had stayed over on Saturday night and they left the apartment on Sunday morning to go to a softball game.  Defendant was

---

[1]     We refer to the victim by her first name only to protect her privacy.

on a team in a recreational league. While watching the game, a woman named Jennifer who knew defendant sat with Rhiannon for awhile. Rhiannon felt Jennifer was interested in being more than just friends with defendant.

After the game, most of the team got together for a barbeque at one of the team member's homes in Whittier. Rhiannon mentioned Jennifer to defendant. She told him that if they got back together, he would have to be more careful about how he interacted with other women. Sometime during the barbeque, Rhiannon noticed defendant was texting Jennifer. She gave defendant "a look" but did not start an argument about it. Both she and defendant had been drinking beer.

Later on in the evening, Rhiannon was taking pictures with some of the other men at the barbeque. Defendant got mad at her, saying she was flirting just to provoke him because she believed he had been acting improperly with Jennifer. Defendant told her they were leaving.

On the drive home to Rhiannon's apartment, their verbal argument escalated. They both said "hurtful" things and defendant told her they were breaking up and it was over for good. Rhiannon called defendant "a piece of shit." When defendant got off the freeway, he pulled the car over and started punching Rhiannon with a closed fist. He hit her multiple times on her left side, as she tried to "curl up into a ball" to protect herself. The argument continued after they arrived at her apartment, name-calling and "screaming" at each other. Rhiannon attempted to go into the bathroom and lock the door, but defendant came after her. She could not recall exactly what was said, but he "smacked" or slapped her face a few more times. Rhiannon believed defendant stopped hitting her when he saw "how bad" her face looked and it "freaked" him out.

Defendant collected some of his things and headed for the door. Rhiannon went after him and hit him, with her right hand, "as hard as [she] could" in the back, and also pushed him. Her left arm hurt so she did not use that arm to hit him. She had first noticed the pain in her left arm after defendant hit her in the car on the way home. Defendant then left the apartment.

3

After defendant left, Rhiannon called her cousin, Leah Romero. Ms. Romero said Rhiannon sounded "hysterical" when she called. When Ms. Romero arrived at Rhiannon's apartment, she said Rhiannon's face looked "beat up, black and blue." Rhiannon also told her she could not move her arm. Ms. Romero drove her to the hospital immediately. Rhiannon suffered a broken left arm and wore a cast for approximately six weeks. She also suffered contusions (swelling and bruising) to the left side of her face.

Rhiannon said defendant had hit her a few times before but she had never reported those prior incidents to the police. During those prior incidents, she sustained bruises, and one time her lip was swollen and cut. She did not report those incidents because "it was just between us." She said she would not have reported the October 6 incident either except she had no choice because she had to go to the hospital for her arm.

The prosecutor moved, pursuant to Evidence Code section 1109, to present the testimony of defendant's former wife, Lorraine Mauries, regarding a prior incident of domestic violence that resulted in defendant's conviction in March 2005. The prosecutor had raised the issue at the beginning of trial, but the court deferred a ruling until after Rhiannon testified. Following her testimony, the court allowed counsel to argue. The prosecutor argued that Ms. Mauries would testify that in March 2005, defendant had barged into her home, through a locked door. He threatened her, shoved her down onto her bed and told her he would "paralyze" her if she called the police. Defendant was arrested and ultimately pled to one count of felony burglary. The prosecution argued the prior incident showed defendant's propensity to use violence and threats of violence against female partners. The defense argued its prejudicial value far outweighed its probative value.

The court ruled that under "the present state of the record" it was exercising its discretion to exclude the testimony under Evidence Code section 352. However, the court explained that if defendant testified, the prosecutor's motion could be renewed. "I'm not threatening. I'm saying this is not a final ruling. If your client testifies, I will allow the People to reopen this issue."

4

After a recess, the defense advised the court that defendant would be testifying. The court ruled that any reference to defendant's 2005 conviction, pending a further ruling on the Evidence Code section 1109 evidence, would be limited to referring to it as a felony conviction, with no further details. The court reiterated that depending upon what issues defendant raised in his testimony, it would allow the prosecution to reargue the probative value of the facts of the prior incident as impeachment and the court would then "reweigh" the admissibility of the evidence.

At the outset of his testimony, defendant admitted his 2005 conviction. Defendant then explained he met Rhiannon in May 2012 and they started dating almost immediately. About six months into their relationship, they started to have problems. Defendant felt Rhiannon drank too much, and would get angry and upset very easily. He said she also got physical when she drank and would hit him repeatedly in the chest, sometimes in his face. She would get out of control and pull out her own hair.

By early October 2013, defendant had moved out of Rhiannon's apartment and they had broken up, but they were once again talking about seeing each other and maybe reconciling. On Sunday, October 6, defendant was scheduled to play in a softball game. Rhiannon came with him to watch. They then went back to the apartment so defendant could shower before they went over to a teammate's house for a barbeque with other members of the softball team.

Defendant said while he was getting ready to leave, Rhiannon started in about Jennifer, claiming she had come to the softball game to watch defendant play. Defendant said that was ridiculous because Jennifer was dating one of his friends on the team who played shortstop. He said Rhiannon did not seem angry, but agitated, and kept talking about it. Defendant told Rhiannon that they were not going to go the barbeque. But Rhiannon said it would be fine, and "convinced" defendant she would not fight about it at the barbeque, so they decided to go.

After they arrived at the barbeque, they both drank some beers and were having a nice time. Later on, defendant was taking some group pictures with teammates at the party, and one shot in particular everyone liked. Defendant sent out a group text with the

5

picture attached.  Jennifer, who was not at the barbeque, was part of the group text. Defendant said Rhiannon saw that Jennifer had texted him back about the picture and got upset.  He said she was starting to get drunk, getting out of control, and acting "trashy." He told Rhiannon they should leave, and she said no, but he eventually convinced her to leave around 8:00 p.m.

During the drive back to Rhiannon's apartment, they started to argue.  Rhiannon told defendant that she acts badly only because he "forces" her to act that way.  At some point, he told her that they were not going to get back together.  Defendant told her she was an embarrassment when she drinks and it was over for good.  Rhiannon responded by slapping him in the face.  Defendant said her physical aggression toward him was making it difficult to drive.  He slapped her with the back of his hand a few times and then grabbed her by the hair to hold her down while he continued to drive home.

Defendant said Rhiannon started to quiet down, so he let go of her.  He told her he thought she was never going to stop drinking, never going to get better and that she was "just like" her dad.  That comment set her off again and she started punching defendant in the face.  Defendant was having a hard time controlling the car on the freeway because she kept trying to punch him.  Defendant slapped her again several times with the back of his hand.  He was not aiming at any particular part of her body, but was swinging his hand at her about shoulder level.  Defendant was just trying to keep control of the car. Defendant conceded that at some point Rhiannon had her arms up in front of her face, and he probably hit her arms a couple of times.  Shortly thereafter, he got off the freeway.

Once they got off the freeway, defendant pulled the car over to the side of the road.  He noticed Rhiannon had a little bit of swelling to one eye.  He pointed it out to her and tried to look at it.  Rhiannon said "see, stupid ass."  So defendant pulled back out into traffic and continued the drive home.  When they got back to the apartment, defendant told Rhiannon to let him look at her eye.  Rhiannon "erupted" and tried to kick him in the groin.  He told her " 'f' you" and went to grab his stuff to leave.

Rhiannon started yelling at him and asked him what he was doing.  Defendant told her he was leaving.  She came up from behind and hit him hard in the back of his head.

6

He turned around and slapped her in the face, and asked "is that what you want." She started to cry and complained her hand hurt. She ran to the bathroom. When defendant tried to ask her if she was okay, she told him to "get the 'f' out here." Defendant said he then grabbed his things and left.

At the conclusion of defendant's direct testimony, the court entertained further argument from counsel about the prior incident. The prosecutor argued that defendant's testimony provided a further basis for the admissibility of the prior conduct evidence. The court agreed, saying "I'm inclined to allow it. I think he's put it directly in issue." Defense counsel argued the same prejudice argument applied, the prior incident was dissimilar, and the prejudice far outweighed any probative value. The court disagreed and granted the prosecution's motion to admit the testimony of defendant's former wife.

In rebuttal, the prosecution offered the testimony of Detective Todd Lockwood who had investigated the current offense. Detective Lockwood interviewed defendant at the police station two days after the incident, and he did not appear to have any injuries at the time. The interview of defendant was videotaped and the tape was played for the jury.

The prosecution then called defendant's former wife, Ms. Mauries. She said that in March 2005, she and defendant were separated, and one night he came over to her home uninvited. They had a brief argument through the back door, which was locked. Ms. Mauries believed defendant was upset about visitation issues relating to their children. Defendant "barged" in through the door, causing the hinges to come off the door. Ms. Mauries ran to her room and defendant followed her. Defendant yelled at Ms. Mauries and threatened her, telling her she better "respect" him. When she rose from where she was sitting on the bed, he pushed her back down. Defendant told her that if she tried to call the police he would "paralyze" her. Ms. Mauries said she was scared and did not try to move again. Defendant eventually calmed down and left after a couple of hours. Ms. Mauries reported the incident the next day. Ms. Mauries attributed defendant's behavior to a substance abuse problem he had at that time.

7

The jury found defendant guilty and found the bodily injury enhancement true. Defendant was sentenced to 12 years in state prison (midterm of 3 years on the offense, 4 years for the great bodily injury enhancement, and 5 years for the prior). The court granted defendant's motion to strike the prior conviction for purposes of the Three Strikes law, but imposed the five-year term pursuant to Penal Code section 667, subdivision (a).

This appeal followed.

## DISCUSSION

Defendant contends the trial court abused its discretion in allowing the prosecution to present, during the rebuttal portion of its case, the testimony of defendant's former wife regarding the prior incident of domestic violence from 2005. Specifically, defendant argues the court's initial ruling sustaining his prejudice objection under Evidence Code section 352 was correct, there was nothing in his testimony on the current offense that increased the probative value or reduced the prejudicial value of the prior incident, and the court failed to properly reweigh the evidence in reversing its order and allowing the evidence as impeachment. We disagree.

"The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138; see also, *People v. Lewis* (2001) 26 Cal.4th 334, 374-375 [trial courts are vested with broad discretion in determining the admissibility of evidence under Evidence Code section 352].) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Evidence of prior acts of domestic violence is admissible under Evidence Code section 1109, subdivision (a)(1) which provides: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving

8

domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

The court initially ruled the potential prejudice of the 2005 incident outweighed its probative value under Evidence Code section 352. However, the court ruled the prosecution could renew its motion if defendant testified. Defendant testified to a version of the incident in which he acted solely in self-defense. He admitted to slapping Rhiannon, but testified that she was the aggressor, slapping and punching him repeatedly in the car and causing him to have difficulty maintaining control. Defendant's testimony also implied Rhiannon likely broke her arm when she hit him on the back of his head when he was trying to leave the apartment.

The prosecution renewed its motion to offer Ms. Mauries's testimony as impeachment. The court indicated it was inclined to agree that defendant's testimony "opened the door." Defendant argued that nothing about his testimony had changed the probative value or prejudicial value of the prior incident and that the court's initial ruling excluding the evidence should stand.

We believe the trial court correctly assessed that in light of defendant's testimony, the prosecution was entitled to offer in rebuttal that this was not the first instance in which defendant acted with physical aggression toward a female partner. The prosecution was entitled to offer evidence that could cast a doubt on defendant's self-defense claim. " 'No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity.' [Citation.]" (*People v. Zack* (1986) 184 Cal.App.3d 409, 415; accord, *People v. Chavez* (2000) 84 Cal.App.4th 25, 28.)

In *People v. Culbert* (2013) 218 Cal.App.4th 184 (*Culbert*), the court rejected a defendant's challenge to the admission of evidence pursuant to Evidence Code section 1109. The defendant was charged with making a criminal threat with the use of a firearm against his minor stepson. The trial court allowed the prosecution to present evidence that the defendant, 11 years earlier, had threatened his former wife that he

9

would kill her. The defendant had not used a weapon during the prior incident. (*Id*. at pp. 187-188.)

*Culbert* held the prior incident was nonetheless properly admitted, despite being factually dissimilar and more than ten years old. The court explained that the "prior offense had probative value. Appellant threatened to kill [his former wife]. Regardless of whether appellant was armed when he broke into the apartment and made the threat, his conduct was relevant to show his intent that his statements be understood as threats, his propensity to make threats to family members and the reasonableness of [his stepson's] fear after the threat was made." (*Id.* at p. 192.) The court further explained that the prior incident was not unduly inflammatory as it did not involve more extreme or violent conduct, there was no risk the jury would be confused by the separate incident, and the incident did not require a lengthy amount of testimony so there would be no undue consumption of time. (*Id*. at pp. 192-193.)

Similarly here, there was no undue consumption of time, the jury was not likely to be confused as the prior incident involved a different victim several years earlier, and the prior incident was not more inflammatory than the charged crime. The prior incident was also probative on defendant's propensity to use violence or threats of violence against female partners, particularly in light of defendant's claim of self-defense.

Defendant also argues the trial court never "decided anew" the question of the admissibility of prior incident evidence. Defendant says the court, following defendant's testimony, simply reversed its ruling without performing the requisite balancing of factors under Evidence Code section 352. Defendant mischaracterizes the record.

"[A] trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213; accord, *People v. Prince* (2007) 40 Cal.4th 1179, 1237 [the record must affirmatively show the court weighed the probative value of the proffered evidence against any prejudice in its admission, but "the necessary

10

showing can be inferred from the record despite the absence of an express statement by the trial court"].)

The record below demonstrates the trial court plainly understood its obligations under Evidence Code sections 1109 and 352. The court's discussions with counsel during the multiple off-record proceedings at which the prosecutor's motion and renewed motion were discussed show that the court weighed both the probative value and the potential prejudice of the proffered evidence. Once defendant testified and raised the self-defense claim, the court's comments make it clear that it had reassessed the probative value of the prior incident as impeachment. The court was not required to say anything more to explain its ruling.

## DISPOSITION

The judgment of conviction is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

11