Filed 10/25/23  P. v. Valladares CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BENJAMIN VALLADARES,<br><br>    Defendant and Appellant. | D080081<br><br><br><br>(Super. Ct. No. FSB19002514) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Harold T. Wilson, Jr., Judge.  Affirmed with instructions to correct the judgment.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Benjamin Valladares of two counts of sexual intercourse or sodomy with a child age 10 or under (Pen. Code, § 288.7, subd. (a); counts 1 & 2) and two counts of forcible lewd or lascivious acts upon a child under the age of 14 (Pen. Code, § 288, subd. (b)(1); counts 3 & 4). The court sentenced him to a prison term of 16 years plus 50 years to life. Prior to trial, the court ruled to allow evidence of Valladares' prior acts of, and his two convictions for, felony child abuse (Pen. Code, § 273d, subd. (a)) pursuant to Evidence Code section 1109, which allows evidence of past domestic violence to show propensity for committing charged acts involving domestic violence.

On appeal, Valladares contends that evidence was inadmissible under Evidence Code section 1108, which allows evidence of past sexual offenses to show propensity for committing charged sexual offenses. As a result, he claims the trial court prejudicially erred in instructing the jury using CALCRIM No. 1191A, the pattern instruction on section 1108 evidence. Valladares further contends the trial court prejudicially erred in failing to instruct the jury that simple battery is a lesser included offense of sexual intercourse or sodomy with a child age 10 or younger.

As we explain below, we first conclude the trial court properly admitted Valladares' prior uncharged offenses under Evidence Code section 1109 and did not err in instructing the jury with a modified version of CALCRIM No. 1191A. Second, we determine the evidence did not warrant an instruction on battery as a lesser included offense of counts 1 and 2; thus, any failure to so instruct was not erroneous. We therefore affirm.

## BACKGROUND

### I.

In July 2020, Valladares was charged with two counts of sexual intercourse or sodomy with his daughter A.L., a child age 10 or under (Pen. Code, § 288.7, subd. (a); counts 1 & 2), and two counts of forcible lewd or lascivious acts upon A.L., a child under the age of 14 (Pen. Code, § 288, subd. (b)(1); counts 3 & 4).

Before trial and over Valladares' objection, the trial court ruled to allow evidence of Valladares' prior physical abuse of children in his care and the resulting conviction under Evidence Code section 1109, finding the evidence's probative value outweighed any prejudice.

### II.

### A.

Consistent with the court's pretrial ruling, at trial the People offered evidence of Valladares' prior acts of child abuse.

A.L. testified that in May 2017, she was at home with Valladares, her cousin M.L., and her four siblings, who at the time were all living with Valladares' mother in Desert Hot Springs. A.L. heard the baby, who was in the bedroom with Valladares, cry, followed by a "spanking" noise. She then saw Valladares exit the bedroom and slap her younger sister in the face, hard enough that she fell into a cabinet and onto the floor. Next, A.L. saw Valladares punch M.L. twice in the stomach, slap her in the face, and grab her by the hair. Finally, Valladares approached A.L. and said, "I forgot . . . about hitting you." Although her recollection was "kind of blurry," she recalled he slapped her hard in the face more than once, leaving a mark.

The next day, A.L. told her teacher, and police officers and social workers came to her house that evening. A.L. feared Valladares might hit

3

her and the other children if she talked; however, she told one of the police officers what happened, that the abuse had started a couple years prior, and that "[t]he way he was hitting [them]" was "getting worse." On the stand, she said Valladares would hit her and the other children "every week." A.L.'s younger sister generally corroborated A.L.'s account.

Over the defense's objection, the trial court permitted the People to play the audio recording of A.L.'s contemporaneous police interview. The recorded interview and the interviewing officer's testimony were largely consistent with A.L.'s testimony. The court also admitted stipulations about Valladares' (1) June 30, 2017 conviction under Penal Code section 273d, subdivision (a) "of two separate counts of felony child abuse . . . , to wit, [A.L.], age 9, and to wit, [M.L.], age 10," and (2) resulting time in custody.

B.

The People also presented evidence of the charged sexual offenses.

The alleged sexual abuse happened over a one-week period sometime in the fall of 2018, when A.L. was ten years old. At that time, A.L. and her siblings were living in San Bernardino with Valladares, Valladares' partner, his partner's mother and stepfather, his partner's grandmother and her son, and the partner's parents' nephew, who A.L. called her "cousin," in a two-bedroom mobile home. Children and Family Services (CFS) received a referral related to A.L. and her siblings in August 2018. Leah Zipperstein, a lead social service practitioner at CFS, visited the home several times, first on September 7, 2018, as part of the investigation. On November 30, 2018, CFS removed the children from the home for "general neglect," and A.L. and her sisters were placed together in a foster home in Barstow.

A.L.'s foster mother was the first person she told about the alleged sexual abuse. On February 22, 2019, over about 45 minutes, an emotional

4

A.L. described two specific incidents before she began crying harder and her foster mother suggested they talk to CFS.

A.L. next talked about Valladares' alleged sexual abuse with Zipperstein, about one week later at the CFS office. Zipperstein spoke with A.L. and her siblings because they knew her from the prior CFS investigation. A.L. described four incidents of sexual abuse. After interviewing the other children, CFS referred A.L. and her family to the Children's Assessment Center (CAC).

The third time A.L. recounted the abuse was during a March 14, 2019 forensic interview at the CAC that lasted roughly one and one-half hours. A forensic interviewer spoke directly with A.L., while two social workers, including Zipperstein, and a detective from the San Bernardino Police Department observed behind a two-way mirror. A video of the CAC interview was admitted into evidence and played for the jury at trial. The charged counts correspond, in reverse order, with the incidents discussed during the CAC interview.

A.L. did not talk about the sexual abuse again until late August 2021, when she testified at Valladares' trial. On the stand, A.L. testified to three specific incidents.

Across these recountings, A.L. described five separate times Valladares sexually abused her.

1.

The first incident A.L. described during the CAC interview corresponds with charge 4 of the information. A.L. told the forensic interviewer she and her siblings had been at the park, but she went home because it was hot. Her cousin was watching television in the living room when Valladares called her into the bathroom.

5

Valladares was showering when A.L. entered the bathroom. He told her to close the bathroom door, pull her pants down, and bend over. She did. He was still in the shower with the water running. He stood behind her and put his "private" "between [her] private and [her] behind." A.L. thought he "[t]ried to put it in [her] behind," which she later clarified was "the butthole," but he did not do so.

Afterward, she left the bathroom. Once Valladares exited, she went back in and cleaned "[her] behind and [her] private," because "[she] didn't think it felt right[,] what he did[.]" While cleaning herself, A.L. saw "a little bit of[ ] . . . discharge," "clearish liquid . . . [i]n [her] private" and nowhere else. She "d[id]n't think it[ was] from [her] dad's private part."

A.L.'s testimony in court about this first incident was generally consistent. She added some additional details—for example, that she asked Valladares what he was calling her for before she entered the bathroom. She also provided some details that differed—for example, that she was in the kitchen rather than the hall when he called her. The pith of the account, however, remained the same. A.L.'s account was further corroborated by Zipperstein, who testified that A.L. relayed essentially the same facts to her in February 2019.

2.

The second incident A.L. described during the CAC interview corresponds with charge 3 of the information. The second incident happened "the next day," when A.L. was home because she "didn't wanna go to the park." She thought her brother may have been sleeping, but aside from him, she and Valladares were alone in the house. Once again, Valladares called her name while he was in the shower and told her to enter the bathroom, which she did. Then "he did the same thing" as before.

6

Although A.L. did not testify about this incident during trial, she relayed essentially the same facts to Zipperstein in February 2019.

3.

The third incident A.L. described during the CAC interview corresponds with charge 2 of the information. When asked if anything went "in the hole," A.L. replied, "The third time he did it."

According to A.L., Valladares was in the shower again, with the sliding door ajar. She was standing in front of the shower. Valladares told her to bend over and pull her pants down. Then "he tried to put his private part in [her] butthole[.]" When the forensic interviewer asked A.L. to tell her more about that, A.L. said that she felt "something kinda go in," and it "felt wrong," because "nothing really goes inside . . . , it comes out instead." She said the "something" "felt . . . soft but hard." After Valladares exited the shower, A.L. cleaned both her "private" and her "behind" with toilet paper. "[T]here was a little bit of blood" when she wiped.

At trial, Zipperstein agreed generally that A.L. had told her about "three similar incidents," but the People did not specifically question her about penetration.

A.L. did not testify about this incident at trial. She could not recall this incident on the stand, even after reviewing the transcript of the CAC interview, but she explained she remembered everything better at the time of the interview and had told the forensic interviewer everything at the time.

4.

The fourth incident A.L. described during the CAC interview corresponds with charge 1 of the information. A.L. said this incident "was different" from the others.

7

A.L. and her siblings were playing games in the house when Valladares called A.L. into the bathroom. No other adult was at home at the time. When A.L. entered the bathroom, she found Valladares hiding behind the bathroom door. He closed the door and told A.L. to lay down and pull down her pants. She laid on her back and saw he had no pants on. A.L. said Valladares' "private part" looked "kinda like . . . a stick," and "was kinda long and . . . a dark peach color, like a dark color[,]" with black hair, and it moved around "[a] little bit" and "was like wiggly or something[,]" with a pink tip.

When A.L. provided a brief overview of all four incidents at the beginning of the CAC interview, she first said Valladares "tried" to put "his private part" in her "private part". When the CAC interviewer asked her to describe everything she could recall about the fourth incident, however, A.L. said Valladares got "on his knees and he put his private part in [hers]." A.L. "closed [her] eyes" because she "didn't wanna look," "didn't wanna see him." She said "when he was trying to put it in my thingy . . . like I don't know if there's a hole in me, um it hurt . . . . It really hurt bad." The forensic interviewer confirmed that Valladares' "private part" was his penis, and that A.L.'s "private part" was what A.L. said was her "va-jay-jay[,] but it's called a vagina." When the forensic interviewer asked if A.L. "actually fe[lt] anything go in the hole," she replied, "Mmm I think my dad's private part." She said "he kept trying to put it in," and "[i]t would hurt but [she] wouldn't say anything," because she "was scared."

Valladares stopped when A.L.'s little sister knocked on the closed bathroom door and said the baby "was acting up." Valladares said "he'd be out in a little bit"; A.L. did not think her younger sister knew she was in the bathroom, too. Valladares got up and told A.L. to pull her pants up. She stood up and some "greyish stuff came out of [her] private part." Valladares

8

cleaned it off the floor with toilet paper. She saw "[a] little bit" of the grey stuff "at the tip" of Valladares' penis, which he cleaned off. Valladares gave A.L. some toilet paper to clean herself with, washed his hands, told her not to tell anybody, and left.

A.L. went to the kitchen but later returned to the bathroom to clean herself. There was "a little bit" of blood, and her "private part hurt [her] a little bit" when she wiped. She said it was "cuz [her] dad put his in there [sic] and . . . I don't know what he was doing that hurt me because I closed my eyes." A.L. "was kinda bleeding when [she] walked."

In court, A.L. testified about this incident as the "third time" her father sexually abused her. As with the first incident, her trial testimony was largely consistent with her CAC interview. As before, she recalled and testified about additional details. For example, she said she and her siblings were playing a video game in Valladares' bedroom when he called her, and she did not go the first time he called because she "was afraid of the same thing that he was going to do." She also testified that the pain was an 8 on a scale of 1 to 10 and that the "gray liquid" was different from the discharge she saw after the first incident.

There were some details A.L. could not remember about this incident by time of trial. For instance, while she recalled telling the forensic interviewer that her father had put his penis inside her, she had no memory of it actually happening. The overarching facts and details were consistent with what she described in her CAC interview, however, both Zipperstein and A.L.'s foster mother corroborated A.L.'s account as consistent with what she told them in February 2019. Zipperstein confirmed that A.L. told her that Valladares' penis penetrated her "vajayjay."

9

5.

At trial, A.L. described a fifth, uncharged incident when asked about the "second time" Valladares sexually abused her. A.L. could not recall whether anyone else was home. Valladares again called her into the bathroom, and when she entered, he was in the shower. He told her to take off her clothes, close her eyes, and get in the shower. A.L. was scared Valladares would hit her, so she obeyed.

The water was on. Valladares picked A.L. up and "was trying to do the same thing he did to [her] when he told [her] to bend over." He held her with her arms around his neck, her legs around his waist, and her body facing his. Valladares was trying to "put it in something," but A.L. "d[id]n't know how to explain it." She "d[id]n't know exactly what he was doing," but it hurt, an 8 on a scale of 1 to 10. She compared the pain to a time when she fell off the monkey bars and a ladder hit her between her legs, making her bleed. At some point, Valladares' partner's mother knocked on the door and said she had to use the bathroom. Valladares said something, but A.L. kept quiet. The woman then "said she couldn't hold it" and left the house. Afterward, Valladares cleaned himself and told A.L. to do the same.

A.L.'s foster mother testified that A.L. told her about this incident in February 2019. And during the CAC interview, A.L. told the forensic interviewer that "one of the [times] . . . [her] dad was doing that to [her]," Valladares' partner's mother knocked on the door but left because "she couldn't hold it."

C.

The People presented evidence to explain the differences between the reports A.L. gave in 2019 and her testimony at trial two and one-half years later. Namely, the forensic interviewer from A.L.'s CAC interview testified

that the purpose of such an interview is "to obtain as much detail as possible about the alleged abuse in the child's own words"; accordingly, forensic interviewers are trained to use open-ended questions. She explained that trauma affects children in different ways. Some children cope by "block[ing]" memories, making them harder to recall over time and causing details to fade. Such children may recount memories in fragments or non-sequentially and may remember certain things at one time but not another.

The forensic interviewer also testified that it is "very difficult" for children who have experienced trauma to remember events chronologically. It is common for such children not to know the day, date, or time of day events happened.

D.

The People did not present any physical evidence of abuse at trial. The forensic nurse clinician who conducted A.L.'s forensic medical examination at the CAC on March 11, 2019, testified that most children seen at the CAC were abused weeks or even years prior. In her experience, children under 12 delay reporting abuse approximately 70% of the time. Because most physical evidence, like DNA, is gone within a week, the CAC usually does not collect any.

In the forensic nurse's experience, even if a child reports abuse right away, the exam will be "normal"—showing no physical sign of abuse— roughly 50% of the time, and about 90% of exams are "normal" in children who delay reporting. "Abnormal" findings, meanwhile, would include sexually transmitted infections or tears or abrasions to the hymen or genital area. To illustrate her point, she discussed a scientific study involving 36 pregnant teenagers. Despite confirmed penetration, only two exams showed any physical signs of penetration; the rest were "normal."

11

A female child who has been vaginally penetrated and experienced some physical trauma typically experiences pain during penetration and for a variable time afterward. Unless trauma is significant, however, signs of injury are unlikely after five or six days, as the genital area "heals very, very quickly and very, very well." There may be no injury at all if the child's hymen is estrogenized or if the penetration was interlabial, as it is "the majority of times." The anal region is also "very stretchy," so it is not uncommon for anal penetration to cause no injuries. In the forensic nurse's experience, if a child reports pain and bleeding, it is "symptom-specific" to penetration or trauma to the genital area and would signify injury.

When she examined A.L., the forensic nurse took a brief history. A.L. relayed that her father had "touched her private part with his private part," that it hurt and there was some bleeding, and that he touched "her butt part with his private part." In response, the nurse conducted both vaginal and anal genital exams. A.L.'s hymen was estrogenized and she had a normal exam "consistent with her history." The nurse testified that A.L.'s description of pain and bleeding was consistent with the alleged abuse.

III.

The defense case focused on undermining A.L.'s credibility.

The defense highlighted inconsistencies between A.L.'s accounts. For example, A.L. told the forensic interviewer that the incidents happened day after day, but on the stand she testified that the incidents occurred every other day. Counsel noted that A.L. testified that Valladares' partner's grandmother and her son were always home, a detail she omitted during the CAC interview when asked who was home during the incidents. Relatedly, Valladares' partner's stepfather testified that he or his mother-in-law and

12

wife's brother, who were always home, would have heard if Valladares had called out to A.L. from the bathroom like she claimed.

The defense also pointed out instances of "leading questions" the forensic interviewer used when A.L. mentioned "think[ing]" Valladares had touched her in a certain way.

In addition, the defense sought to call into question A.L.'s description of Valladares' penis. An investigator shared photographs of Valladares' genitalia, showing his penis was uncircumcised and had a scar on the underside—two distinctive details not mentioned by A.L. The investigator, however, took no photographs of Valladares' erect penis, as A.L. would have seen it.

The defense also cross-examined A.L.'s younger sister, who testified that A.L. would lie to protect her. On redirect, the sister explained, as an example, that once when Valladares' partner's mother got angry at her for making food, A.L. said it was her idea so she would get in trouble instead.

IV.

A.

After the defense rested, the court and parties discussed proposed jury instructions. The full discussion was not on the record.

As relevant here, all agreed to instruct with CALCRIM No. 1127 (sexual intercourse or sodomy with a child age 10 or younger) for the elements of counts 1 and 2. There was no reported discussion of any lesser included offenses for those charges.

Everyone also agreed to instruct with CALCRIM No. 1111 (forcible lewd or lascivious acts upon a child under the age of 14) for the elements of counts 3 and 4. All further agreed to instruct the jury on two lesser included offenses for those charges: (1) attempted forcible lewd act upon a child under

13

age 14 in violation of Penal Code sections 664 and 288, subdivision (b)(1), which they added after an off-the-record discussion; and (2) a lewd act upon a child under age 14 in violation of Penal Code section 288, subdivision (a).

In addition, the court and parties discussed the People's proposed instruction under CALCRIM No. 1191A (evidence of uncharged sex offenses). Defense counsel objected to the instruction because it addressed evidence of prior uncharged *sex* offenses for use as propensity evidence in cases charging sex offenses under Evidence Code section 1108.  The court allowed the instruction over defense counsel's objection.

B.

The jury received instructions consistent with this discussion.  Among the instructions given were:  CALCRIM No. 220, confirming Valladares was presumed innocent unless the People proved his guilt beyond a reasonable doubt; CALCRIM No. 301, instructing that a single witness' testimony can prove a fact; CALCRIM No. 303, reminding the jury evidence admitted for a limited purpose was to be considered for only that purpose and no other; CALCRIM No. 359, requiring proof beyond a reasonable doubt to convict; CALCRIM Nos. 1127 and 1111, specifying the elements of the charged offenses and reminding the jury that the People must prove those elements; Penal Code section 664 and CALCRIM No. 1110, specifying the lesser included offenses for counts 3 and 4; CALCRIM No. 1190, providing that "[c]onviction of a sexual assault crime may be based on the testimony of a complaining witness alone"; the People's modified version of CALCRIM No. 1191A, permitting the jury to consider the prior felony child abuse as propensity evidence for the charged sexual offenses; and CALCRIM No. 822, providing the elements of felony child abuse the jury had to find proven by a

14

preponderance of the evidence before they could consider it for the limited purpose of propensity.

## V.

In closing, the People focused on the consistencies between A.L.'s descriptions of the sexual abuse over time. As to the evidence of prior child abuse, the People stated: "Evidence Code 1109 says that you can find that a person who commits physical acts of violence against children is more likely to commit sexual acts of violence against them." The People also stated: "If you find that the defendant committed that act of child abuse, and I submit to you he was convicted of it, then you can find it was more likely that he committed this act of sexual violence." Defense counsel objected but was overruled. In total, the People's argument lasted roughly two and one-half hours.

Defense counsel, in closing argument, summarized Valladares' defense as follows: "The truth never changes, but lies do[.] . . . [A.L.] lied to you." Counsel contended, "You have two possible conclusions in this case. One, [Valladares] molested his daughter [A.L.]; two, . . . he did not and . . . she . . . lie[d] to you."

To support this theory, defense counsel again emphasized the inconsistencies in A.L.'s various recountings of the alleged sexual abuse. In so doing, counsel compared what A.L. said happened the "first time" on the stand against what she said happened the "first time" during all prior retellings, and did the same with the second, third, and fourth times. For example, defense counsel noted that the second incident A.L. described to Zipperstein happened outside the shower while she was bending over, but the second incident she described on the stand and to her foster mother happened inside the shower while Valladares was holding her.

15

Defense counsel also addressed the Evidence Code section 1109 propensity evidence. She asked the jury to "use [their] common sense" to find that parents who "disciple" their children "are not automatically inclined to pick one of their children" and sexually abuse them over "a random four days." The defense characterized these two categories of events as "two different extremes."

## VI.

After deliberating for approximately one and one-half hours and without submitting any questions, the jury returned a verdict of guilty on all four charged counts.

On November 30, 2021, the trial court sentenced Valladares to a determinate sentence of 16 years on counts 3 and 4 and an indeterminate sentence of 50 years to life on counts 1 and 2. The abstract of judgment specifies that the sentence for count 4 is 8 years and "006" months, although the total sentence imposed is correctly noted to be 66 years.

## DISCUSSION

Valladares appeals on two grounds. First, he contends that the uncharged acts of child abuse were inadmissible under Evidence Code section 1108; thus, the court prejudicially erred in instructing the jury with a modified version of CALCRIM No. 1191A. Second, he argues that the court prejudicially erred in failing to instruct the jury sua sponte that simple battery is a lesser included offense of sexual intercourse or sodomy with a child age 10 or younger. As explained below, we disagree with both arguments.

I.

A.

We first address Valladares' claim that the propensity evidence was inadmissible under Evidence Code section 1108, as this argument underlies his claim that the contested instruction was erroneous.

1.

Generally, "evidence of specific instances of [a person's] conduct[ ] . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101.) There are, however, two exceptions relevant here.

First, under Evidence Code section 1108, if the defendant is accused of a sexual offense, evidence of his or her commission of one or more other sexual offenses is admissible to establish propensity. (Evid. Code, § 1108, subd. (a).) A "sexual offense" is a crime under state or federal law involving conduct identified in specified sections of the Penal Code. (See *id.*, subd. (d)). CALCRIM No. 1191A is used when evidence is admitted under section 1108.

Second, under Evidence Code section 1109, if the defendant is accused of an offense involving domestic violence, evidence of his or her commission of other acts of domestic violence is admissible to establish a propensity for domestic violence. (Evid. Code, § 1109, subd. (a)). CALCRIM No. 852A is used for section 1109 evidence.

Even if admissible under one of these sections, a court may still exclude the evidence if it decides the probative value is "substantially outweighed" by the likelihood it will unduly consume trial time or creates a "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

17

2.

Valladares argues evidence of his prior acts of felony child abuse is inadmissible under Evidence Code section 1108. This is true. Felony child abuse under Penal Code section 273d is not a "sexual offense" under Evidence Code section 1108. (See Evid. Code, § 1108, subd. (d).)

That is inconsequential here, however, as the trial court admitted the evidence under Evidence Code section *1109*. The court could admit Valladares' prior acts of felony child abuse here because the charged sexual offenses "involv[ed] domestic violence" under section 1109. (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138 (*Poplar*).)

Evidence Code section 1109 defines "domestic violence" as either (1) the definition set forth in section 13700 of the Penal Code, or (2) subject to a hearing under Evidence Code section 352, the definition set forth in section 6211 of the Family Code if the act occurred no more than five years prior to the charged offense. (Evid. Code, § 1109, subd. (d)(3)). "Abuse" encompasses intentionally causing bodily injury to another. (Pen. Code, § 13700, subd. (a).) Family Code section 6211 defines domestic violence as "abuse" against various persons, including "[a] cohabitant" per Family Code section 6209, "[a] child of a party," or "[a]ny other person related by consanguinity or affinity within the second degree." (Fam. Code, § 6211, subds. (b), (e) & (f).)

First, Valladares' prior felony child abuse is "evidence of [his] commission of other domestic violence" under Evidence Code section 1109, subdivision (a)(1). Felony child abuse, which is "cruel or inhuman corporal punishment or an injury resulting in a traumatic condition" upon a child, qualifies as abuse. (Pen. Code, § 273d, subd. (a).) That abuse happened in May 2017, less than two years before Valladares' charged offenses. (Evid.

18

Code, § 1109, subd. (d)(3)). Finally, the persons abused fall under Family Code section 6211. A.L. and her siblings, as Valladares' children, are covered by subdivisions (e) and (f), and M.L. is covered under subdivision (b) as a cohabitant because she "regularly reside[d]" in the house at the time of the abuse. (Fam. Code, § 6209.)

Second, the crimes with which Valladares was charged are "offense[s] *involving* domestic violence." (Evid. Code, § 1109, subd. (a)(1), italics added.) Lewd or lascivious acts by a caretaker on a dependent under 14 accomplished "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim" constitute "abuse" under Penal Code section 13700, subdivision (a), and thus "domestic violence" under Evidence Code section 1109. (Pen. Code, § 288, subd. (b)(2).) Likewise, sexual intercourse or sodomy with a child 10 years old or younger intentionally causes bodily injury per Penal Code section 13700, subdivision (a), and thus is abuse constituting domestic violence. (Pen. Code, § 288.7, subd. (a).) Other courts have admitted evidence of uncharged acts of domestic violence under section 1109 in cases charging sexual offenses. (See *Poplar*, *supra*, 70 Cal.App.4th at p. 1139 [affirming admission of evidence of prior domestic violence to show propensity for rape, "a higher level of domestic violence"]; *People v. Trujillo Garcia* (2001) 89 Cal.App.4th 1321, 1332-1336 [finding admissible evidence of violation of domestic violence restraining order subsequent to charged rape and rejecting defendant's claim that such "acts do not reflect a tendency toward sexually assaultive behavior"].)

Accordingly, evidence of Valladares' prior domestic violence was admissible under Evidence Code section 1109 unless its probative value was substantially outweighed by the possibility of undue prejudice. (Evid. Code, § 352.) Here, the trial court repeatedly found this evidence did not violate

19

Evidence Code section 352, and Valladares does not argue on appeal this exercise of discretion was erroneous.

We therefore conclude evidence of Valladares' prior acts of domestic violence, while inadmissible under Evidence Code section 1108, was properly admitted under Evidence Code section 1109.

B.

We next address whether the given propensity instruction was erroneous. We review de novo whether a jury instruction correctly states the law, looking at the instructions and trial record as a whole and considering the challenged instruction in that context. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Mills* (2012) 55 Cal.4th 663, 680.) Where reasonably possible, we interpret the instructions to support the judgment. (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.)

Valladares contends that, because the uncharged prior acts of felony child abuse were inadmissible under Evidence Code section 1108, the trial court erred in instructing the jury with CALCRIM No. 1191A, the corresponding propensity instruction for uncharged sex offenses. The People concede that the prior acts were not "sexual offenses" and thus the court erred in using CALCRIM No. 1191A rather than CALCRIM No. 852A, the propensity instruction for uncharged domestic violence that corresponds with Evidence Code section 1109. We, however, reject Valladares' argument and decline to accept the People's concession, as we conclude the given instruction was a correct and non-erroneous statement of law. (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1021 [appellate court not bound by Attorney General's concession].)

As explained *ante*, the challenged propensity evidence was properly admitted, as Evidence Code section 1109 allows the permissive inference that

20

a defendant who has committed acts of domestic violence, like felony child abuse, is more likely to commit further and escalated acts "*involving domestic violence*," a phrase courts have construed broadly. (Evid. Code, § 1109, italics added.) In *Poplar*, for example, evidence of a defendant's prior physical altercations with two former partners was properly admitted in a case charging him with forcible rape of a third partner. (See *Poplar, supra*, 70 Cal.App.4th at pp. 1138-1139.) The *Poplar* court rejected the claim that there was "'no logical disposition toward committing rape based on a prior physical hassle or verbal contest between domestic partners'" because the charged offense, rape, involved domestic violence, albeit at "a higher level." (*Ibid.*)

Here, the permissive inference of propensity is even more logical than that in *Poplar*. The charges against Valladares involved one of the same victims as the prior acts. The prior acts happened fewer than two years before the charged offenses. Following the 2017 child abuse, A.L. told the police she thought the abuse would continue to escalate, which she reaffirmed on the stand. On this record, the inference that Valladares' prior felony child abuse predisposed him to committing further and escalated acts of domestic violence, including sexual offenses against children, was logical. Thus, a propensity instruction was warranted to guide the jury as to the permissible use of the evidence properly before it.

And here, the given instruction correctly stated the applicable law as interpreted by *Poplar*. Like CALCRIM No. 852A, the given instruction allowed the jury to infer propensity to commit the charged offenses based on other uncharged acts. The given, modified instruction merely made explicit CALCRIM No. 852A's implicit and allowable inference that the jury could consider Valladares' commission of prior acts of domestic violence—the 2017

21

child abuse—in deciding if he was predisposed to commit a higher form of domestic violence—the charged sexual offenses.  Further, the given instruction, like CALCRIM No. 852A, informed the jurors that:  (1) they should disregard the child abuse evidence if the People failed to prove it by a preponderance of the evidence; (2) they could, but did not have to, draw the permissive inference; (3) should they conclude Valladares committed the 2017 child abuse, that fact is merely one factor to consider with all the evidence; (4) the People still must prove each charge beyond a reasonable doubt to find Valladares guilty; and (5) the evidence could be used only for the limited purpose of "determining whether [the d]efendant has a propensity for violence against children and/or to prove an element of the charged offense."[1] While instructing with an unmodified CALCRIM No. 852A instruction may have been preferable, the minor deviations in wording here did not amount to error, even if delivered under the heading "[CALCRIM ]No. 1191A."  (Cal. Rules of Court, rules 2.1050(f) [while use of the CALCRIM instructions "is strongly encouraged," a judge has discretion to provide different instructions] & 2.1055(a)(1)(B) [recognizing ability to instruct on approved instructions that have been "substantially modified"].)

In addition, the jury instructions collectively (1) reaffirmed that Valladares was presumed innocent unless the People proved his guilt beyond a reasonable doubt, (2) cautioned the jury that evidence admitted for a limited purpose was to be considered for only that purpose, (3) reminded the jury the People bore the burden of proving each element of the charged offense, and (4) outlined the elements of the felony child abuse the People proved by a preponderance of the evidence before the jury could consider

---

[1]    The second purpose stated in the given instruction concerns only charges 3 and 4, and thus is neither applicable nor addressed here.

22

those acts for the limited purpose of propensity. Finally, the People raised Evidence Code section 1109's permissible inference in only two sentences in a closing argument that lasted about two and one-half hours, and Valladares' counsel directly refuted those statements in closing.

In this context, we conclude the jury's charge correctly stated the law, and thus we perceive no instructional error. Accordingly, we need not reach the issue of prejudice.

## II.

Valladares also contends the trial court prejudicially erred in failing to instruct sua sponte on simple battery as a lesser included offense of counts 1 and 2; thus, those convictions must be reversed. Reviewing de novo, we conclude the court did not err. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

## A.

Valladares argues, and the People "[a]ssum[e] without conceding[,]" that battery is a lesser included offense of counts 1 and 2. We agree. Because the information merely incorporates the statutory definition of the charged offenses, we apply the elements test. (*People v. Fontenot* (2019) 8 Cal.5th 57, 65.) "A battery is any willful and unlawful use of force or violence upon the person of another." (Pen. Code, § 242.) The charged offenses, meanwhile, require "penetration, however slight," of the vagina, genitalia, or anus by a penis. (Pen. Code, §§ 288.7, subd. (a) & 289, subd. (k)(1).) One therefore cannot commit the offense of sexual intercourse or sodomy with a child age 10 or younger without also committing a battery, making the latter a lesser included offense of the former. (See *People v. Hughes* (2002) 27 Cal.4th 287, 366.)

23

B.

The trial court had a duty to instruct on battery if "substantial evidence supports a finding that the defendant touched the victim in a way other than charged." (*People v. Miranda* (2021) 62 Cal.App.5th 162, 176 (*Miranda*).) The court need not instruct on a lesser included offense, however, "whenever *any* evidence is presented, no matter how weak." (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63 (*Strozier*).) Rather, the court must give the instruction only if there is "substantial evidence" that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218 (*Cole*).)

Substantial evidence is evidence a reasonable jury could find persuasive. (*Cole, supra*, 33 Cal.4th at p. 1218.) In assessing whether there is substantial evidence of a lesser included offense, a court determines the bare legal sufficiency, and not the weight, of the evidence. (See *Miranda, supra,* 62 Cal.App.5th at p.177.) When doing so, a court does not evaluate credibility. (*Breverman, supra*, 19 Cal.4th at p.162.) Any doubts as to the evidence's sufficiency should be resolved in favor of giving the instruction. (*Strozier*, *supra*, 20 Cal.App.4th at p. 63.)

C.

As relevant here, the charged offenses required an act of "sexual intercourse" or "sodomy" with the victim. (Pen. Code, § 288.7, subd. (a); *People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 (*Mendoza*).) "Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis." (*Ibid*.) Penetration in this context can be mere intrusion of the labia majora, the vulva's exterior boundaries. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371.) Sodomy, likewise, entails "penetration, however slight," of the anus by the penis. (*Mendoza*, *supra*,

24

240 Cal.App.4th at p. 79; Pen. Code, § 286, subd. (a).) Sodomy similarly "requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin." (*People v. Paz* (2017) 10 Cal.App.5th 1023, 1038.)

Valladares contends substantial evidence exists to support a jury finding of only the lesser offense of battery for counts 1 and 2 because alleged inconsistencies in A.L.'s statements and testimony could have led a reasonable jury to find that Valladares "did not actually penetrate [A.L.]'s vagina, genitalia, or anus." The People claim "there was no evidence of a 'harmful or offensive' touching other than sexual intercourse or sodomy." We are persuaded by the People's reasoning.

Valladares essentially argues the evidence of penetration is equivocal. As to count 2, Valladares contends "[A.L.] repeatedly and consistently told the forensic examiner that appellant '*tried* to put his private part' in her 'butthole'" and notes she did not testify about this incident at trial. As to count 1, Valladares notes that A.L. first stated in her CAC interview that Valladares "tried" to penetrate her and only later said he did, and at trial she testified she had no memory of penetration. We, however, disagree with Valladares' assessment of the evidence.

That A.L. did not describe the count 2 incident at trial may bear on the weight of the evidence supporting the charge; it is not, however, "substantial evidence" on its own of the commission of only a battery. Further, Valladares is incorrect that A.L. "repeatedly and consistently" stated in her CAC interview that he only "tried" to penetrate her anus. When asked if anything went "in the hole" while discussing Valladares' first act of sexual abuse, A.L. replied, "The third time he did it." Although A.L. said several times Valladares "tried" to put his penis in her anus, when the forensic interviewer

25

specifically asked A.L. to "[t]ell [her] about him trying to put his private part in [her] butthole" and whether she "fe[lt] something happening with [her] butthole," A.L. said she felt "something kinda go in." She expounded that it "felt wrong" because "nothing really goes inside" there, "it comes out instead." The blood that A.L. described finding when she wiped her genital and anal area afterward further indicates penetration. The forensic nurse testified it is not unusual for anal penetration to result in no injury, but bleeding would evidence penetration or injury. This evidence is not, as Valladares posits, equivocal as to penetration.

As to count 1, A.L. did not, as Valladares contends, state only at the end of her interview that he penetrated her. During her initial, brief rundown of all the incidents at the start of her CAC interview, she shared that Valladares "tried" to put "his private part" in her "private part," "it hurt really bad," and she "was kinda bleeding when [she] walked" afterward. But when asked to describe everything she could recall about the fourth incident (charged as count 1), A.L. stated unequivocally that Valladares "put his private part in [hers]," and clarified that she was talking about his penis and her vagina. A.L. then said "[i]t really hurt bad" when Valladares was "trying" to put his penis inside her. When the forensic interviewer asked if A.L. "actually fe[lt] anything go in the hole," A.L. replied, "Mmm I think my dad's private part," and when asked what Valladares did after he put his penis inside of her, A.L. said "he kept trying to put it in," and "[i]t would hurt." Once again, when A.L. wiped herself afterward, she found blood on the toilet paper and her genital area hurt. That evidence supports penetration.

This evidence was corroborated by others at trial. Zipperstein testified that A.L. told her in 2019 that Valladares put his penis in "her vajajay," it hurt badly, and she bled afterward. And on the stand, A.L. said Valladares

26

"tried" to put his penis inside her multiple times over the course of several minutes and the pain was an 8 on a scale of 1 to 10. She testified about the blood on the toilet paper when she cleaned herself afterward. Although she remembered telling the forensic interviewer that Valladares had penetrated her vagina, she could only remember the pain, not the penetration, roughly three years later. The forensic nurse testified that there may be no physical signs of penetration in a child with an estrogenized hymen, like A.L., or if the penetration were merely interlabial, but that pain and bleeding signify penetration or injury. Again, this evidence of penetration is not ambivalent.

Meanwhile, the record is devoid of any actual evidence Valladares attempted penetration but was unsuccessful such that he could have committed a battery but not the charged offense. Unlike in *People v. Ngo* (2014) 225 Cal.App.4th 126, 157, where the defendant admitted to touching the victim but denied penetration, here, Valladares' defense was that A.L. fabricated her account. There was no evidence to support a middle ground between A.L.'s account of two instances of penetration and Valladares' denial that anything ever happened.

We thus determine there was not substantial evidence to persuade a reasonable jury Valladares was guilty of battery but not the charged offenses.

\* \* \*

We conclude battery is a lesser included offense of sexual intercourse or sodomy with a child age 10 or younger. Even so, there was not substantial evidence here to support a conviction on the lesser but not the greater offense for counts 1 and 2. Thus, the trial court did not err in not instructing on battery. Because we find the trial court did not err, we need not reach the issue of prejudice.

27

## DISPOSITION

We affirm. However, we note there appears to be a typographical error in the abstract of judgment as to the sentence for count 4. We thus sua sponte direct the trial court to correct the abstract of judgment to reflect that the sentence for count 4 is 8 years and "00," rather than "006," months and to forward a certified copy to the Department of Corrections and Rehabilitation. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-187 [appellate courts can order on their own motion corrections of abstracts of judgment that do not accurately reflect the oral judgment at sentencing].)

CASTILLO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


RUBIN, J.

28